**ST. PAUL FIRE & MARINE INSURANCE COMPANY, a Minnesota corporation, Plaintiff,**

v.

**CITY OF GREEN RIVER, WYOMING, City of Rock Springs, Wyoming, Sweetwater County, State of Wyoming Joint Powers Water Board, a governmental entity, Defendant.**

No. 98–CV–1007–B.

United States District Court, D. Wyoming.

March 27, 2000.

Rex O. Arney, Scott P. Klosterman, Casper, WY, Richard E. Day, Casper, WY, Robert K. Cox, McLean, VA, for plaintiff.

Clark D. Stith, Rock Springs, WY, for defendant.

### ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

This case is about the extent of a performance bond surety's obligation to finish a construction project within the underlying construction contract's completion deadline after a default by the surety's principal. After reading the briefs, hearing oral arguments, and being fully advised in the premises, the Court **FINDS** and **ORDERS** as follows:

#### Background

The material facts are not in dispute. On February 10, 1997, Westates Construction Co. ("Westates") entered a contract with the State of Wyoming Joint Powers Water Board (the "Board") for the construction of a water treatment plant in Green River, Wyoming (the "Project"). Under the terms of the construction contract, Westates was to achieve substantial completion of the Project on or before December 1, 1998. Significantly, the construction contract provided that time was of the essence and that the Board would be entitled to liquidated damages in the

amount of $2,500 per day for delays after the completion deadline, with allowance made for any extensions granted under the contract.

Prior to construction, St. Paul Fire & Marine Insurance Company ("St.Paul"), as surety, provided a performance bond to the Board, the obligee, to guarantee the principal Westates' performance under the construction contract. Paragraph 4 of the performance bond defines St. Paul's options for performance under the bond in the event of a default by Westates:

When the Owner has satisfied the conditions of Paragraph 3 [requiring, *inter alia*, notice to the Surety, declaration of Contractor default, and Owner's agreement to pay the Surety the balance of the contract price], the Surety shall promptly and at the Surety's expense take one of the following actions:

4.1 Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

4.2 Undertake to perform and complete the construction contract itself, through its agents or through independent contractors; or

4.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

1. After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

2. Deny liability in whole or in part and notify the Owner citing reasons thereof.

Construction began on March 3, 1997. The Project experienced significant delays of which the causes are in dispute. On January 16, 1998, the Board terminated its contract with Westates, filed suit against Westates in state court, and made a claim against the St. Paul performance bond. St. Paul began a due diligence investigation of the Project to ascertain how it should proceed regarding its duties under the performance bond. Simultaneously, negotiations were commenced involving representatives of the Board, Westates, and St. Paul. These negotiations resulted in a compromise proposal, outlined in a term sheet, which provided, among other things, for: (1) a mutual release between the Board, Westates, and St. Paul, with claims preserved against Forsgren Associates, Inc., the project engineer; (2) removal of Forsgren from construction management responsibilities (though he would continue to provide design services); (3) dismissal of the Board's lawsuit against Westates; (4) rescission of the Board's notice of termination; and (5) completion of the Project by St. Paul. The compromise proposal allowed St. Paul to utilize Westates personnel, though St. Paul would retain management decision making authority. The compromise proposal also called for a May 14, 1999 completion date. According to the term sheet, St. Paul was to provide more detailed information regarding completion of the Project to the Board at a February 25, 1998 meeting.

As planned, representatives of St. Paul made presentations to the Board on February 25, 1998. At the meeting, two letters from Steven Grunsfeld of St. Paul were delivered to the Board. In the first letter, Mr. Grunsfeld indicated St. Paul's willingness to proceed under the compromise proposal, which had not been officially approved by either St. Paul or the Board. In the second letter, Mr. Grunsfeld reported St. Paul's preliminary determination that the Board's termination of Westates was wrongful, but announced St. Paul's election to complete the Project itself under Paragraph 4.2 of the performance bond, albeit under a reservation of rights.

In a February 28, 1998 letter, Dr. Joseph J. Oliver, Chairman of the Board, announced the Board's response to St. Paul's communications. Dr. Oliver wrote:

St. Paul representatives stated [at the February 25, 1998 meeting] that St. Paul would complete the [Project] no sooner than September 24, 1999, despite a contract completion date for the Project of December 1, 1998. Accordingly, the [Board] is justifiably insecure that St. Paul will complete the Project in a timely manner.

In addition, St. Paul representatives have made clear St. Paul's intention to utilize the personnel employed by Westates ... to complete the Project ... even though the [Board] does not consent to Westates or its personnel completing the Project. St. Paul's announced intention to use Westates to finish the Project without consent of the [Board] is an anticipatory breach of the requirements of Section 4.1 of the Performance Bond.

Accordingly, please be advised that the [Board] refuses to allow St. Paul to complete [the Project] under Section 4.2 of the Performance Bond.

On March 3, 1998, St. Paul brought an action in this Court seeking a declaratory judgment that the Board's refusal to permit St. Paul to complete the Project was a material breach of the performance bond, thus exonerating St. Paul from any further obligation under the bond. In its answer to St. Paul's Fourth Amended Complaint, filed on January 15, 1999, the Board asserted counterclaims against St. Paul for breach of contract, breach of the covenant of good faith and fair dealing, tortious bad faith, and violation of Wyo.Stat.Ann. § 26–15–124(c), which allows for recovery of attorney's fees where an insurance company's refusal to pay the full amount of a claim is unreasonable or without cause. St. Paul moved for summary judgment and the Board moved for partial summary judgment on its second, third, and fourth counterclaims.

### Summary Judgment Standard

A motion for summary judgment must be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and a 'genuine' issue exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Occusafe, Inc. v. EG&G Rocky Flats, Inc.*, 54 F.3d 618, 621 (10th Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

### Analysis

Central to this dispute is whether St. Paul committed an anticipatory breach of the performance bond when it announced at the February 25, 1998 meeting that it would not complete the Project until September of 1999, well past the completion deadline in the construction contract. The Board contends that St. Paul's actions constituted an anticipatory breach because St. Paul, as surety, stepped into Westates'

shoes in the construction contract and was bound by the "time is of the essence" clause contained therein. Thus, according to the Board, St. Paul's announcement that it would not meet the completion deadline constituted a repudiation of the performance bond, thereby justifying the Board's decision to treat the performance bond as repudiated and sue for damages. St. Paul, on the other hand, contends that it was not required to complete the Project within the original completion deadline, and was instead required by Paragraph 5 of the performance bond only to proceed with "reasonable promptness." In St. Paul's view, the Board's action prohibiting St. Paul from completing the Project was a material breach which excused St. Paul from any liability under the bond. Secondarily, the parties dispute whether St. Paul was allowed, under Paragraph 4 of the performance bond, to use Westates personnel without the Board's express consent.

▮▮▮▮ Fundamentally, this is a contract dispute, and general principles of contract interpretation apply with equal force to surety contracts. *See Wyoming Mach. Co. v. United States Fidelity & Guar. Co.*, 614 P.2d 716, 719 (Wyo.1980). The Court's duty in construing the performance bond is to ascertain, and give effect to, the intentions and mutual understandings of the contracting parties. *See Jackson Hole Racquet Club Resort v. Teton Pines Ltd. Partnership*, 839 P.2d 951, 958 (Wyo.1992). In other words, a performance bond should " 'be fairly construed with a view to effect the object for which it was given and to accomplish the purpose for which it was designed.' " *Cates Constr. Inc. v. Talbot Partners*, 21 Cal.4th 28, 86 Cal.Rptr.2d 855, 980 P.2d 407, 413 (1999) (quoting *Roberts v. Security T & S Bank*, 196 Cal. 557, 238 P. 673 (1925)). Where there is a written contract, the Court "look[s] no further than the four corners of the contract to determine the intent of the parties." *Holst v. Guynn*, 696 P.2d 632, 634 (Wyo. 1985). Extrinsic, or "parol" evidence may

be used only where the court determines as a matter of law that the contract is ambiguous. *See Jackson Hole Racquet Club*, 839 P.2d at 959. Subsequent disagreement of the parties over the meaning of the contract does not create such ambiguity. *See State Farm Fire & Cas. Co. v. Paulson*, 756 P.2d 764, 766 (Wyo.1988) Where the contract terms are not ambiguous, "the disposition of disputes relating to such a contract properly may be accomplished by a summary judgment." *Continental Ins. Co. v. Page Eng'g Co.*, 783 P.2d 641, 651 (Wyo.1989).

**1. The Board's Claim that St. Paul Committed an Anticipatory Breach**

▮▮▮▮ The Board claims that St. Paul committed an anticipatory breach by announcing that it would not complete the Project until September of 1999. The Supreme Court of Wyoming outlined the law of anticipatory breach in *J.B. Service Court v. Wharton:*

> "An anticipatory breach of contract is one committed before the time has come when there is a present duty of performance, and is the outcome of words or acts evincing an intention to refuse performance in the future.... In ascertaining whether an anticipatory breach of a contract has been committed by a party, it is the intention manifested by his acts and words which controls, and not his secret intention. Moreover, in order to predicate a cause of action upon an anticipatory breach, the words or conduct evidencing the breach must be unequivocal and positive in nature.... In order to justify the adverse party in treating the renunciation as a total breach, the refusal to perform must be of the whole contract or of a promise or obligation going to the whole consideration, and it must be distinct, unequivocal, and absolute."

632 P.2d 943, 945 (Wyo.1981) (quoting 17 Am.Jur.2d Contracts §§ 448, 450 (1964)). Where a party commits an anticipatory repudiation, the other party is excused

from performing under the contract and may sue immediately for damages. *See County of Solano v. Vallejo Redevelopment Agency,* 75 Cal.App.4th 1262, 90 Cal. Rptr.2d 41, 51 (1999). Whether a party's actions constitute an anticipatory repudiation, like other issues of contract interpretation, is a question of law for the Court to decide. *See J.B. Serv. Court,* 632 P.2d at 945. Of course, St. Paul's announcement that it would not meet the December 1, 1998 completion deadline could not constitute an anticipatory repudiation unless St. Paul had an absolute duty to finish the Project by December 1, 1998. Likewise, if St. Paul was within its rights to use Westates personnel, its announced plan to do so would not be an anticipatory breach.

### a. St. Paul's Obligation to Finish the Project by the Completion Deadline

Contrary to the Board's contentions, the Court concludes that, while St. Paul was liable for delay damages, it would not be in material breach if it failed to finish the Project by the completion deadline. The Board is certainly correct that, as a general rule, a performance bond surety's liability is coextensive with that of the principal. *See* 11 *Couch on Insurance* 3d § 163:32 (1998). "Since the express purpose of the contract performance bond is to secure the performance of the specified contract, it is obvious that the bond and the contract to secure the performance of which it was given should be construed together." *Id.* at § 163:34. Here, there is no dispute that time was expressly made of the essence in the underlying construction contract, and Westates was obligated to complete the Project by December 1, 1998, adjusted for extensions. Consequently, St. Paul, as Westates' surety, was likewise bound by the "time is of the essence" clause and completion deadline. *Cates Constr.,* 86 Cal. Rptr.2d 855, 980 P.2d at 414–15. This means that, upon the principal's default, the surety is liable for damages caused by the principal's delay if the principal was liable for such damages in the underlying

contract. *See Cates Constr.,* 86 Cal. Rptr.2d 855, 980 P.2d at 414–15; *Riva Ridge Apartments v. Robert G. Fisher Co.,* 745 P.2d 1034, 1039 (Colo.Ct.App.1987). Here, Paragraph 6.3 of the performance bond explicitly states that St. Paul is liable for liquidated damages caused by Westates' delay. No doubt St. Paul would be in breach of the performance bond if it failed to pay liquidated damages for delays attributable to Westates. In this sense, the Board is correct that St. Paul steps into the shoes of Westates and is bound by the liquidated damages clause.

It is a far leap from this conclusion, however, to reach the Board's position that St. Paul would be in material breach of the performance bond if the Project was not completed on the construction deadline. To the contrary, the Court is convinced that the required pace of St. Paul's performance was unambiguously defined by Paragraph 5, which provides that "[i]f the Surety does not proceed with reasonable promptness, the Surety shall be deemed in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond."

The performance bond's express contemplation of a tardy completion by the surety due to contractor delays, manifested by its provision of liquidated damages for contractor delays, runs contrary to the notion that the Board could terminate St. Paul if it exceeded the completion deadline. Additionally, the Board's interpretation is unreasonable in light of the fact that a performance bond surety's duty of performance is typically triggered only when the construction project is already in trouble and behind schedule. As St. Paul points out, it would not be unusual for a contractor on a two-year project that is one year behind to be terminated shortly before the completion deadline. The Board's interpretation imposing an absolute duty of timely delivery would impermissibly require St. Paul to be "superhu-

man." *Martin J. Simko Constr. v. United States,* 11 Cl.Ct. 257, 273 (1986), *vacated on other grounds,* 852 F.2d 540 (Fed.Cir. 1988). Because the Board's interpretation leads to impractical and commercially absurd results, it is unreasonable and cannot be accepted by the Court. *L & A Contracting Co. v. Southern Concrete Serv., Inc.,* 17 F.3d 106, 110–11 (5th Cir.1994). In addition, none of the cases cited by the Board support its proposition that an obligee may terminate a surety for failure to accelerate construction to make up for contractor delays.

The Board cites *Department of Ins. v. United States,* 33 Fed.Cl. 188 (1995), in which the receiver of a performance bond surety sought to invalidate the default termination of a surety on a federal project. In that case, the surety failed to advance the project at all two months after it took over the project, failed to provide the owner with a schedule or strategy for project completion, failed to respond to repeated inquiries regarding the lack of progress, and failed to respond to the architect's request to cover the project to prevent water damage. *Id.* at 191–92. The surety was terminated when, after seven months on the project, it had advanced the project by only ten percent, had taken three months to secure a general contractor, and even longer to secure a roofing subcontractor. *Id.* at 194. *Department of Ins.* certainly stands for the proposition that abysmal performance by a surety evincing a complete disregard of its contractual duties can be grounds for a default termination. It does not say, however, that a surety proceeding with reasonable promptness can nevertheless be terminated if it will not meet the construction contract completion deadline.

Furthermore, contrary to the Board's representation in its brief, *Discount Co. v. United States,* 213 Ct.Cl. 567, 554 F.2d 435 (1977), does not even involve a performance bond surety. Instead, *Discount Co.* concerns termination of a contractor for failure to diligently perform its contractual duties. *Id.* The final case cited by the Board, *Howard Constr. Co. v. Teddy Woods Constr. Co.,* 817 S.W.2d 556 (Mo.Ct. App.1991), is clearly distinguishable from the case at bar. In *Howard,* a subcontractor's surety was notified that its principal was in default on three subcontracts which required prompt completion. 817 S.W.2d at 561. The surety first told the obligee that a new contractor had been arranged. *Id.* A month later, the obligee learned that the purported completion contractor was not interested in the work. *Id.* Six weeks after being notified of the default, the surety had not obtained a completion contractor or made any other progress toward completing the subcontracts. *Id.* Therefore, the obligee was within its rights to arrange for completion of the subcontracts itself and sue for damages. *Id.* at 561–62. Again, *Howard* stands merely for the proposition that a surety is in default where it does not promptly undertake its obligations under the performance bond; it does not support an obligee's right to terminate a surety for failure to accelerate the pace of construction. In short, *Howard* says nothing more that Paragraph 5 of the performance bond, which explicitly states: "If the Surety does not proceed ... with reasonable promptness, the Surety shall be deemed in default."

■ Because the Court finds that the performance bond unambiguously provides that St. Paul's obligation was only to proceed with reasonable promptness, St. Paul would not have been in default under the bond if the Project was not completed by the completion deadline, so long as St. Paul did in fact proceed with reasonable promptness in completing the Project.[1] Even assuming, for the sake of argument, that St. Paul did have an absolute duty to complete the Project by the completion

---

1. As previously stated, St. Paul would have been obligated to pay damages caused by Westates' delay or delays caused by St. Paul's own failure to act with reasonable promptness, as provided in Paragraph 6 of the performance bond.

deadline, St. Paul's actions did not manifest the type of unequivocal renunciation of the contract necessary to constitute an anticipatory breach. For example, an attempt to negotiate performance on different terms than provided for under the contract is not an anticipatory repudiation because it shows an intention to abide by the contract.

See *Pacific Coast Eng'g Co. v. Merritt–Chapman & Scott Corp.*, 411 F.2d 889, 894 (9th Cir.1969). Similarly,

> when there is a disagreement as to the meaning of terms in a contract, one party's offer to perform in accordance with his interpretation is not itself an anticipatory breach.... If the offer appears to be made in the good faith belief that the offeror's interpretation is correct, that will be evidence of his continued adherence to the agreement.

*Pacific Coast*, 411 F.2d at 894. On the other hand, a party cannot condition his performance due under the contract on the other party's acceptance of an additional term not contained in the contract. *See United Cal. Bank v. Prudential Ins. Co.*, 140 Ariz. 238, 681 P.2d 390, 429 (App.1983). Far from categorically disclaiming a duty to perform under the performance bond, St. Paul promptly began a due diligence investigation, took part in negotiations with the Board's counsel, and provided the Board with a schedule for its performance under Paragraph 4.2. Even if, contrary to the Court's conclusion, St. Paul were required to promise completion by December 1, 1998, St. Paul's actions could at least be viewed as an offer to negotiate performance on terms different that in the performance bond. *See Pacific Coast*, 411 F.2d at 894. Moreover, St. Paul can not be said to have insisted on an additional term, because the Board terminated St. Paul days after St. Paul made its February 25, 1998 presentation. In any case, St. Paul had a good faith basis to believe that its interpretation of the contract was correct, so that its offer of performance consistent with that interpretation was not an anticipatory breach. *See id.* Because St. Paul did not unequivocally renounce its obligations under the performance bond, the Board did not have the right to treat St. Paul's projected completion schedule as an anticipatory breach.

### b. Use of Westates Personnel

■ The Board's second basis for its claim of anticipatory breach is that St. Paul planned to use Westates personnel as part of the team assembled to complete the Project. In the Board's interpretation of the performance bond, St. Paul was allowed to select one, and only one, option for performance under Paragraph 4. Paragraph 4.1, which allows St. Paul to arrange for Westates to complete the Project, requires the Board's consent. St. Paul instead announced its election to complete the project itself pursuant to Paragraph 4.2. The Board claims that, in electing to proceed under Paragraph 4.2, St. Paul was prohibited from using any Westates personnel without the Board's consent. The Board's interpretation is contrary to the unambiguous language of the performance bond, defies common sense, and is unreasonable in light of industry practices.

Turning first to Paragraph 4.2 of the performance bond, the performance option selected by St. Paul, it is clear that there are no limitations on who St. Paul could utilize to complete the Project. In proceeding under Paragraph 4.2, St. Paul assumed primary responsibility to complete the contract, and with that responsibility came the freedom to assemble the project team of its choosing. In contrast, a surety electing to proceed under Paragraph 4.1 does not assume primary responsibility for completing the contract, and the owner is required to maintain an ongoing contractual relationship with the terminated contractor. While it makes sense that the owner would have the right to object to such a "shotgun wedding" to the contractor it just terminated, it does not follow that the Board would have this right when the surety assumes primary contractual responsibility. In fact, the surety performance op-

tions contained in the performance bond are standard in the industry, and it is common practice for a surety that elects to perform the project itself to hire the principal's employees under the direction of a consultant, just as St. Paul did here. *See* James A. Knox, Jr. *The ABC's of Contractors' Surety Bonds*, 82 Ill.B.J. 244, 246 (1994). While the Board accuses St. Paul of trying to "create a hybrid action from the two paragraphs," it is actually the Board that is attempting to graft the owner consent provision contained in Paragraph 4.1 onto the performance option actually selected by St. Paul, Paragraph 4.2. Because St. Paul had the right to utilize Westates personnel as part of its project team, St. Paul's plan to use such personnel could not constitute an anticipatory breach. In sum, neither St. Paul's proposed completion schedule nor its proposed use of Westates personnel constituted an anticipatory breach, and the Board did not have the right to terminate St. Paul, as it did in Dr. Oliver's February 28, 1998 letter.

### 2. The Board's Material Breach

Having determined that the Board did not have the right to terminate St. Paul, the focus now shifts to the implications of the Board's wrongful termination of St. Paul. If the Board's action constituted a material breach, St. Paul is excused from further performance under the contract. *See Dragon Constr., Inc. v. Parkway Bank & Trust*, 287 Ill.App.3d 29, 222 Ill.Dec. 648, 678 N.E.2d 55, 58 (1997). "A material breach occurs where the covenant not performed is of such importance that the contract would not have been made without it." *Id.* Under the performance bond, St. Paul possessed four options for performance in the event of Westates' default: (1) arrange for Westates to complete the Project; (2) complete the Project itself; (3) arrange for a new contractor to complete the Project; or (4) determine the amount of its liability under the performance bond and tender that amount to the Board. The effect of the Board's termi-

nation of St. Paul was to divest St. Paul of its ability to minimize its liability by selecting the lowest cost option and by directing the construction or participating in the contractor selection process. Courts have consistently held that an obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material breach, which renders the bond null and void. *See L & A Contracting*, 17 F.3d at 111; *Balfour Beatty Constr. Inc. v. Colonial Ornamental Iron Works, Inc.*, 986 F.Supp. 82, 86 (D.Conn.1997); *Insurance Co. v. Metropolitan Dade County*, 705 So.2d 33, 34–35 (Fla.Dist.Ct.App.1997); *Dragon*, 222 Ill. Dec. 648, 678 N.E.2d at 58. In *Balfour*, for example, the performance bond provided that when the obligee declared a principal default, the surety could remedy the default, or, after reasonable notice to the surety, the obligee could arrange for remedy of the default at the surety's expense. 986 F.Supp. at 84. The obligee in *Balfour* failed to notify the surety of the default, allowed the principal to complete the work in an untimely fashion, then sought recovery from the surety. *Id.* at 85–86. Because the obligee's actions "deni[ed] the [surety] the opportunity to exercise any of its options under the performance bond," the obligee could not recover under the performance bond. *Id.* at 86. *Dragon* also involved a performance bond that gave the surety the option, upon the principal's default, of either performing the contract itself or else arranging for a replacement contractor. 222 Ill.Dec. 648, 678 N.E.2d at 56. When the obligee found the principal's performance inadequate, however, the obligee hired a replacement contractor on its own. *Id.* at 57. The court held that, because the surety "was stripped of its contractual right to minimize its liability under the performance bond by ensuring that the lowest responsible bidder was selected to complete the job," the performance bond was rendered null and void. *Id.* at 58. St. Paul was

likewise prejudiced by the Board's actions. While the Board did properly notify St. Paul of Westates' default, it prohibited St. Paul from exercising its contractual right to perform itself or to participate in the selection of the replacement contractor. Because the Court concludes that St. Paul would not have entered the performance bond in the absence of its performance options under Paragraph 4, the Board's action depriving St. Paul of those options was a material breach, which discharged St. Paul from any further duty of performance under the bond. *See id.*

### Conclusion

St. Paul's announcement of a September 24, 1999 completion date and its planned use of Westates personnel in completing the Project did not amount to an anticipatory repudiation. In contrast, the Board committed a material breach of the performance bond by refusing to allow St. Paul to complete the Project. Because St. Paul did not breach its duties under the performance bond, the Board's counterclaims for breach of contract, breach of the covenant of good faith and fair dealing, tortious bad faith, and violation of Wyo.Stat.Ann. § 26–15–124(c) must fail.

For the foregoing reasons, it is hereby **ORDERED** that St. Paul's Motion for summary judgment on its declaratory judgment complaint is **GRANTED.** It is further **ORDERED** that the Joint Powers Water Board's Motion for summary judgment is **DENIED.** All of the Joint Powers Water Board's counterclaims against St. Paul are **DISMISSED WITH PREJUDICE.** All other pending motions are **DENIED** as moot.