The Bank of Brewton ("the Bank") hired Akers Group International, Inc. ("Akers"), to renovate the Bank's main office in Brewton, Alabama. On December 12, 1991, the Bank and Akers executed a "Project Management Agreement" and a "Supplement to Project Management Agreement" detailing the renovations to be done and the manner and time of their completion. Akers enlisted International Fidelity Insurance Company ("IFIC") to issue a performance and payment bond on its behalf. The bond detailed what would constitute a default in the performance and how the parties would deal with a default, should one occur. The language in the bond was the standard language used by *Page 749 
the American Institute of Architects in performance bonds.
The performance bond, to which Akers, the Bank, and IFIC were parties, stated, in relevant part:
 "If there is no Owner Default, the Surety's obligation under this Bond shall arise after:
 "3.1 The owner [the Bank] has notified the Contractor [Akers] and the Surety [IFIC] at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and
 "3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and
 "3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner."
Akers began work on the Bank in January 1992. On June 17, 1992, the Bank president, Jerry M. Kelly, Sr., wrote to Akers and IFIC that the Bank was considering declaring a contractor default because he believed that Akers had failed to comply with certain provisions of the project management agreement. In the letter, Kelley called a meeting of the Bank, Akers, and IFIC, within 15 days, as provided in paragraph 3.1 of the performance bond. The meeting among representatives of the Bank, Akers, and Tatum Bonding Insurance, Inc. (as a representative of IFIC), took place on June 25, 1992.
The Bank contended that Akers was not complying with the project management agreement because, it said, Akers was not seeking prior approval for the materials and the fixtures it was installing in the Bank. Akers contended that the Bank was delaying the project by failing to make choices regarding the materials called for under the agreement or frequently changing its mind after Akers had acted on the Bank's choices. After the meeting the parties decided that Akers should continue with the construction.
In August 1992, the Bank began withholding payments from Akers. On September 24, 1992, Kelly wrote James Tatum of Tatum Bonding, stating that
 "[t]he bank has contended that the contractor is in default for, among other things, failing to get owner approval on contract documents, drawings, furnishings, etc. . . . The bank is concerned that . . . the contractor may not be able, from a financial standpoint, to complete the contract. If this occurs, the bonding company will be called on to complete the contract. The bank requests the bonding company's guidance as to releasing the remaining funds due under the contract."
Kelley sent IFIC a copy of the letter he had sent to Tatum. IFIC wrote the Bank seeking clarification of the Bank's *Page 750 
allegations. IFIC pointed out that, although the Bank seemed to allege in its letter that a contractor default had occurred, the Bank had not filed a notice of default as required under the performance bond. IFIC asked the Bank to clarify immediately the status of the project. On October 14, 1992, the Bank wrote IFIC asking, "What constitutes a contract default? How is contractor default notice given to the surety?" On October 29, 1992, the Bank again wrote to IFIC noting that Akers and the Bank had met on June 25, 1992, to discuss the construction project, that the parties decided at that time that Akers should continue with the project, that since the June 25 meeting numerous change orders had been submitted and numerous letters had been exchanged between the parties, and that the Bank had responded to all correspondence. The October 29, 1992, letter to IFIC continued:
 "The bank still believes that they are not being provided with the quality of work and material and the furnishings specified in the construction documents. The purpose of this letter is to notify you, the bonding company, of the contractor's default referred to herein. . . . [D]emand has been made on the contractor and a deadline of ten (10) days was given within which to provide the items requested. Please be advised that should the contractor refuse the owner's request or fail to provide the construction requested within the time deadline, then the Bank of Brewton shall call on [IFIC] to assume the completion of the renovation construction project referred to above."
The Bank's actions, however, belied its words, because on November 11, 1992, the Bank allowed the project architect to certify that the work under the contract was substantially complete as of November 10, 1992.
After numerous other letters were exchanged, IFIC sent the Bank a letter dated April 30, 1993, stating that IFIC had not received a formal termination notification from the Bank, and that, therefore, the surety had no obligation with respect to the dispute between the Bank and Akers. The Bank then sent IFIC a letter dated May 20, 1993, that did not address whether the Bank had formally terminated the contract with Akers, but did advise IFIC that the Bank intended to file an action against IFIC after the Bank and Akers had resolved their dispute.
During this exchange of letters between the Bank and IFIC, Akers, on November 25, 1992, sued the Bank in the United States District Court for the Southern District of Alabama, alleging breach of contract. That case was voluntarily dismissed without prejudice so that Akers and two of its subcontractors could file complaints in the Circuit Court of Hinds County, Mississippi (where Akers's offices are located and where the project management agreement was executed), which they did on February 17, 1993, alleging breach of contract, damages for additional work preformed over and above the requirements of the contract, intentional wrong, insult and abuse necessitating punitive damages, defamation by libel and slander, intentional tortious interference with contractual or business relations, and conversion. The Bank answered in the Mississippi case and moved for a summary judgment; the trial court denied the summary-judgment motion on July 31, 1996.
Then, on November 15, 1996, nearly four years after Akers had filed its action in Mississippi, the Bank sued Akers, G.A. West Co., Inc. (an Alabama company that was one of Akers's subcontractors), and IFIC in the Escambia Circuit Court, seeking damages for breach of contract. Akers and the subcontractor answered and *Page 751 
counterclaimed, asserting the same claims they had raised in their Mississippi action and reserving their right to proceed in the Mississippi case. Akers also asserted a conversion claim against Jerry Kelly, Sr., president of the Bank. On May 3, 2000, IFIC moved for a summary judgment, arguing that there was no genuine issue of material fact as to IFIC's liability as surety under the performance and payment bond, and stating that IFIC was entitled to a judgment as a matter of law.
On August 2, 2000, the Bank moved for a summary judgment in the Escambia Circuit Court case on Akers's counterclaims under Mississippi law seeking punitive damages and attorney fees and alleging libel, slander, and conversion. Kelly also moved for a summary judgment on the single claim brought against him for conversion. Although the pretrial-motion hearing was scheduled for September 7, 2000, the materials in support of the Bank's and Kelly's motions for a summary judgment were not served by mail until August 29, 2000, and did not reach Akers's attorneys until Friday, September 1, 2000.
The Escambia Circuit Court granted IFIC's motion for a summary judgment on September 27, 2000, and, on November 18, 2000, certified that judgment as a final appealable judgment pursuant to Rule 54(b), Ala.R.Civ.P. Also on September 27, 2000, the trial court entered a partial summary judgment in favor of the Bank as to Akers's punitive-damages and attorney-fee claim, the libel and slander claims, and the conversion claim, and entered a summary judgment in favor of Kelly on Akers's claim of conversion. The Bank appealed the summary judgment for IFIC and Akers cross-appealed the summary judgment for Kelly and the partial summary judgment for the Bank. The Bank moved to dismiss the cross-appeal because, it argued, the summary judgments that Akers appealed had not been certified as final pursuant to Rule 54(b), Ala.R.Civ.P., and, therefore, the Bank argued, were not appealable. The motion to dismiss the cross-appeal was denied on September 26, 2001. Both the appeal and the cross-appeal are therefore before this Court.
In the appeal (case no. 1000387), the only issue is whether the trial court properly entered a summary judgment in favor of IFIC, as the surety, in the action to enforce IFIC's indemnity obligations under the performance and payment bond. The Bank argues that there are material factual disputes as to whether the surety's indemnity obligations had been properly invoked and that the provisions in the performance bond regarding invoking the indemnity provisions are ambiguous. IFIC argues that the language in the bond is clear and unambiguous, that the bond was promulgated by the American Institute of Architects as a model surety bond agreement, and that there is no factual dispute as to whether the Bank complied with the requirements of the bond in invoking IFIC's obligations as the surety.
In the cross-appeal (case no. 1000855), Akers argues (1) that the trial court should not have considered the Bank's motion for a partial summary judgment or Kelly's motion for a summary judgment because, it says, the materials submitted in support of those motions were untimely served in violation of Rule 56(c)(2), Ala.R.Civ.P.; (2) that the trial court erred in entering a summary judgment for Kelly and a partial summary judgment for the Bank because, it says, the motions for a summary judgment relied on evidentiary materials that were never placed in the trial court record; (3) that the trial court erred in entering a partial summary judgment for the Bank because, it argues, the record was factually incomplete as to choice-of-law issues presented with Akers's claims for punitive *Page 752 
damages and attorney fees to which it would be entitled under Mississippi law for a breach of contract attended by an intentional wrong, insult, and abuse; (4) that the trial court erred in entering for the Bank a partial summary judgment because, it says, the factual record was incomplete as to Akers's claims alleging libel, slander, and tortious interference with business and contractual relations; (5) that the trial court erred in granting the Bank's summary-judgment motion on Akers's conversion claim because, it says, the record was incomplete; and (6) that the trial court erred in entering a summary judgment on Akers's conversion claim against Kelly because, it says, the record was incomplete.[1]
All issues on appeal address the propriety of the summary judgments; therefore, we review them under a de novo standard, with no presumption of correctness given to the ruling of the trial judge. Gossett v. TwinCounty Cable TV, Inc., 594 So.2d 635, 638 (Ala. 1992). To grant a motion for a summary judgment, the court must determine that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Mitchell v. Richmond, 754 So.2d 627, 628
(Ala. 1999). If the party moving for a summary judgment makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to present substantial evidence creating a genuine issue of material fact. Id. at 628. "In a breach of contract action, a summary judgment is properly entered only where the contract is unambiguous and the facts are undisputed." Britt v. Gonzalez,710 So.2d 928, 930 (Ala.Civ.App. 1998).
The Bank argues that the trial court erred in entering a summary judgment for IFIC, as surety under the project management agreement between the Bank and Akers. The Bank contends that the provisions of the performance bond governing when the bond can be invoked are ambiguous and that factual disputes exist as to whether IFIC's indemnity obligations had been properly invoked. IFIC maintains that the language in the performance bond is clear and that there are no factual disputes as to whether the Bank properly invoked IFIC's obligations as surety. The argument turns on whether the contractor-default provisions of paragraph 3 of the performance bond set out conditions precedent, as IFIC argues, or whether they constitute covenants that need not be fulfilled before IFIC must fulfill its obligations, as the Bank argues.
A performance bond is an express, written bilateral contract to which the general principles of contract interpretation apply. See, e.g.,School Bd. of Escambia County v. TIG Premier Ins. Co., 110 F. Supp.2d 1351
(N.D.Fla. 2000); St. Paul Fire Marine Ins. Co. v. City of GreenRiver, 93 F. Supp.2d 1170 (D.Wyo. 2000); Carriage Town, Inc. v. LandCo.,Inc., 998 F. Supp. 646 (D.S.C. 1998). "Whether a provision in a contract is a condition precedent depends, not upon formal words, but upon the intent of the parties, to be deduced from the whole instrument." Fidelity Cas. Co. of New York v. DeLoach, 280 Ala. 497, 502, 195 So.2d 789,793 (1967), citing Floyd v. Pugh, 201 Ala. 29, 77 So. 323 (1917). The Bank asks this Court to find the language in the performance bond ambiguous because it *Page 753 
fails to state that the surety's obligations "will not arise unless and until" or will "only arise after." However, in determining whether terms in a contract constitute a condition precedent, we do not look for "magic" words, but we look to the document as a whole for its intended meaning. The plain language of paragraph 3 is that in the event of a contractor default, the surety's obligation under the bond shall ariseafter the occurrence of the events listed in subparagraphs 3.1, 3.2, and 3.3. The owner first must give proper notice, call a meeting, discuss the problems, and attempt to resolve them (subparagraph 3.1); then, if the problems are not resolved, the owner must declare a contractor default, formally terminating the contractor's right to complete the contract, and must declare the default at least 20 days after giving notice (subparagraph 3.2); and finally the owner must agree to pay the balance of the contract to the surety or to a new contractor who will complete the contract as originally agreed (subparagraph 3.3).
The Bank claims that these subparagraphs create covenants that apply only when the obligee calls upon the surety to undertake the actions listed in paragraph 4 of the performance bond, which states that "When the Owner has satisfied the conditions of Paragraph 3, the surety shall promptly and at the Surety's expense" arrange for the contractor to complete the contract, complete the contract itself, obtain a new contractor to complete the contract, or waive its right to do any of these things and either pay damages to the owner or deny liability for damages. The Bank argues that IFIC can be held liable for delays in construction without triggering a full default as spelled out in paragraphs 3 and 4, and that, because it is seeking to enforce liability for delays rather than for a full default, it does not have to comply with paragraph 3.
The fact that during litigation parties adopt conflicting interpretations of language in a contract does not create an ambiguity that will preclude a summary judgment where, in fact, no ambiguity exists. See J. Griffin Elec., Inc. v. Dunn Constr. Co., 622 So.2d 314
(Ala. 1993). The Bank points to no language in the performance bond that supports its construction of paragraph 3. Paragraph 6 does state that "the Surety is obligated . . . for [6.1] [t]he responsibilities of the Contractor for correction of defective work . . . [6.2] [a]dditional legal, design professional, and delay costs . . . and liquidated damages, or . . . actual damages caused by delayed performance . . ."; however, paragraph 6 begins with the following language: "After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the . . . Surety is obligated for" the listed costs and damages. The clear intent of the performance bond, taken as a whole, is for IFIC to serve as an insurer for the completion of the project as a whole. The project architect certified the project as substantially complete as of November 10, 1992. IFIC's obligations to the Bank concluded upon completion of the project.
The Bank argues, in the alternative, that if it was supposed to comply with paragraph 3 of the performance bond and declare a contractor default before IFIC became obligated to pay under the performance bond, it substantially complied with the terms of paragraph 3 and IFIC therefore is obligated to pay. While IFIC concedes in its brief that the Bank complied with the requirements of subparagraph 3.1 that it give proper notice and call a meeting of the parties, that was the only subparagraph with which the Bank complied. *Page 754 
A declaration of default and the termination of a contract are not to be undertaken lightly. The United States Court of Appeals for the Fifth Circuit has stated:
 "A declaration of default sufficient to invoke the surety's obligations under the bond must be made in clear, direct, and unequivocal language. The declaration must inform the surety that the principal has committed a material breach or series of material breaches of the subcontract, that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of its bond."
L A Contracting Co. v. Southern Concrete Servs., Inc., 17 F.3d 106,111 (5th Cir. 1994). That Court continued:
 "It is not asking too much of obligees to require that when they wish to give up on a principal and look to the surety for satisfaction, rather than merely to urge the principal to what they hope will be better performance, they must say so to the surety in clear, unequivocal terms."
17 F.3d at 111 n. 18. At most, the Bank can point to threats in the various letters it sent to the contractor or to representatives of IFIC that it would declare a contractor default. Although the correspondence details many threats to declare a contractor default, perhaps intended to inspire greater diligence on the part of the contractor, a mere threat is not sufficient to trigger the obligations of a surety. In fact, IFIC repeatedly reminded the Bank that the Bank had not declared a contractor default. The Bank requested information from IFIC as to how to declare a contractor default, and even went so far as to inform IFIC in the October 29 letter that it believed a contractor default had occurred and that if Akers did not complete the project the Bank would call on IFIC to do so; however, the Bank never terminated Akers's right to finish the project, thereby triggering IFIC's responsibility as surety to act to complete the project.
The Bank was required by the performance bond to give proper notice, to call a meeting, to discuss the problems, and to attempt to resolve them; and then to declare a contractor default, formally terminating the contractor's right to complete the contract at least 20 days after giving notice; and to agree to pay the balance of the contract to the surety or to a new contractor who would complete the contract as originally agreed. Even if the Bank's letter to IFIC on October 29, 1992, is considered an adequate declaration of default, the Bank failed to pay the balance of the contract price to the surety or to a contractor selected to complete the original contract; thus, the Bank did not substantially comply with the performance bond. We, therefore, hold that the trial court did not err in entering a summary judgment for IFIC, and we affirm that judgment.
In case no. 1000855, the cross-appeal, Akers contends that the trial court should not have considered the Bank's motion for a summary judgment because, it says, the motion was untimely filed and this untimely filing unduly prejudiced Akers. Given the exceedingly long history of this case, which has now spanned almost 10 years, it is worthy of note that the Bank waited until August 29, 2000 — precisely 9 calendar days before the September 7, 2000, pretrial-motion hearing in the Escambia Circuit Court — to serve its briefs and documents in support of its motion for a summary judgment. See Rule 56(c)(2), Ala.R.Civ.P., requiring that "[t]he motion for summary judgment, with all supporting materials, including any briefs, shall be served at least ten (10) days before the time fixed for the hearing, except that a court may conduct a hearing on less *Page 755 
than ten (10) days' notice with the consent of the parties concerned."[2]
Moreover, Rule 6, Ala.R.Civ.P., requires that, "When the period of time prescribed or allowed is less than eleven (11) days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation." Because the time period required for the filing of a motion under Rule 56(c) is less than 11 days, Saturdays, Sundays, and legal holidays are not included in the calculation. Monday, September 4, 2000, was Labor Day, a legal holiday in Alabama; therefore, Saturday, September 2, Sunday, September 3, and Monday, September 4, are excluded from the calculation of the 10 days required before the September 7, 2000, motion hearing. To have been timely, therefore, the Bank had to have served its motion for a summary judgment and all supporting materials by August 23, 2000, which it did not do.
Akers asserts that the failure of the trial court to require the Bank and Kelly to comply with the 10-day requirement worked considerable prejudice on Akers, and that the summary judgment should therefore be reversed as having been an abuse of discretion. Hilliard v. SouthTrustBank of Alabama, N.A., 581 So.2d 826 (Ala. 1991); Middaugh v. City ofMontgomery, 621 So.2d 275 (Ala. 1993). Akers alleges that the Bank and Kelly served their briefs and affidavits in support of their motions for a summary judgment by mail on August 29, 2000, and that they did not arrive at Akers's attorney's office until Friday, September 1, 2000. Because all materials in opposition to a motion for a summary judgment must be filed no later than two days before the hearing, pursuant to Rule 56(c)(2), Ala.R.Civ.P., Akers had only one regular business day, Tuesday, September 5, to prepare and file materials in opposition to the briefs and affidavits. With only one business day to prepare, and with witnesses spread throughout Mississippi and Alabama, and Akers's lead counsel located in Atlanta, Georgia, Akers was unable to prepare affidavits in opposition to the materials in support of the motion for a summary judgment. Akers instead filed an "Objection and Brief in Opposition to the Motions for Summary Judgment." Pursuant to Rule 56(f), Ala.R.Civ.P., Akers submitted an affidavit stating why it could not properly present its case in opposition to the motion for summary judgment by affidavit.
Although Rule 56(f) does state that "the court may deny the motion for summary judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just," under the facts of this case, we hold that it was an abuse of discretion for the trial court to enter a partial summary judgment for the Bank and a summary judgment for Kelly, and we reverse those judgments and remand the case for further proceedings.
1000387 — AFFIRMED.
1000855 — REVERSED AND REMANDED.
Moore, C.J., and Brown, Harwood, and Stuart, JJ., concur.
[1] Akers also raises a seventh issue — whether the trial court properly entered a summary judgment in favor of IFIC on the Bank's claims. Because we address that issue in the portion of the opinion dealing with the Bank's claims against IFIC, we do not address it here in our discussion of Akers's issues on appeal.
[2] There is no suggestion that Akers consented to the hearing. In fact, Akers filed an "Objection and Brief in Opposition to the Motions for Summary Judgment." *Page 756