# United States Court of Appeals

## For the First Circuit

No. 08-2576

ST. PAUL FIRE & MARINE INSURANCE CO.,

Plaintiff, Appellee,

v.

VDE CORPORATION,

Defendant, Appellant,

BANCO SANTANDER PUERTO RICO,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José Antonio Fusté, U.S. District Judge]

Before

Torruella, Lipez and Howard,
Circuit Judges.

Edilberto Berríos-Pérez, with whom Fernando E. Longo-Quiñones and Berríos & Longo Law Offices, P.S.C., were on brief for appellant.
Leslie Alvarado-Lliteras, with whom Carlos A. Steffens and Alvarado, Viñas & Fernández, P.S.C., were on brief for appellee.

May 5, 2010

**LIPEZ, Circuit Judge.**  Defendant VDE Corporation (VDE) appeals from the district court's grant of summary judgment in favor of plaintiff St. Paul Fire & Marine Insurance Company (St. Paul) releasing St. Paul from its obligations under a construction performance bond.  After careful review, we affirm.

**I.**

The relevant facts are largely undisputed.  In the spring and summer of 2005, VDE arranged for the construction and financing of a residential real estate project, Villas Del Este Project, in Gurabo, Puerto Rico (the project).  In April 2005, VDE entered into a construction contract with F&R Contractors Corporation (F&R), engaging the company to serve as contractor for the project.  VDE obtained financing for the project from Banco Santander Puerto Rico (BSPR).

On June 28, 2005, St. Paul, as surety, issued a performance bond (the bond) for the benefit of VDE, as obligee, to guarantee performance under the construction contract by F&R, as principal.  The bond was a standard document, the American Institute of Architects document A312 performance bond (AIA A312).  That same day, St. Paul issued a "dual obligee rider" to the bond, adding BSPR as a co-obligee.

Paragraph 4 of the surety bond sets forth St. Paul's options for performance in the event that F&R defaults under the construction contract.  Paragraph 4 provides:

-2-

When the Owner [VDE] has satisfied the conditions of Paragraph 3 [setting forth requirements for declaring contractor default], the Surety [St. Paul] shall promptly and at the Surety's expense take one of the following actions:

4.1  Arrange for the Contractor [F&R], with consent of the Owner, to perform and complete the Construction Contract; or

4.2  <u>Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors</u>; or

4.3  Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

4.4  Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

> .1  After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

> .2  Deny liability in whole or in part and notify the Owner citing reasons therefor.

(Emphasis added.)

On November 7, 2007, VDE declared F&R in default on its obligations as contractor and terminated F&R's right to continue work on the project. In support of its declaration of default, VDE stated that F&R had refused to abide by its contractual obligations, failed to work at a reasonable pace, abandoned work on the project, insisted on collecting payments not due, and failed to act in good faith. Two days later, VDE notified St. Paul that it had declared F&R in default and requested that St. Paul perform its obligations under the bond. VDE informed St. Paul that it "oppose[d] that the project be completed with F&R as contractor, either directly or indirectly."

On November 16, St. Paul requested certain documentation from VDE in order to investigate VDE's allegations of contractor default. St. Paul also acknowledged VDE's statement that it opposed the use of F&R as completion contractor and advised VDE that "should the Surety choose to complete under Paragraph 4.2 of the Bond, the terms of the Bond do not allow the Obligee to oppose the contractor that the Surety selects as its own completion contractor, whether it be the Principal or otherwise."

On December 6, St. Paul informed VDE that it had not yet received much of the requested documentation related to its investigation of VDE's allegations of contractor default. St. Paul listed the missing documents and asked that VDE provide the information as soon as possible. VDE responded that same day,

asserting that "[t]he time for the surety to act has expired" and declaring St. Paul in default on its obligations under the bond.

On December 14, following VDE's declaration that St. Paul was in default, St. Paul filed this declaratory judgment action against VDE and BSPR in federal district court. St. Paul requested a declaration that, inter alia, VDE had breached the terms of the bond by not permitting the surety to take action under the circumstances set forth in Paragraph 4 of the bond, and asked that St. Paul be released from its obligations under the bond. VDE and BSPR filed counterclaims, alleging that St. Paul had failed to perform its obligations under the bond.

On December 26, VDE provided St. Paul with some of the documentation previously requested, and stated again that it would "not consent to F&R performing additional work at the project, either directly or indirectly." VDE further stated that it would provide St. Paul with an additional fifteen-day period to perform. On January 10, 2008, St. Paul notified VDE that it intended to undertake completion of the project pursuant to Paragraph 4.2 of the bond, using F&R as completion contractor. St. Paul explained that if VDE "maintains the position that the Surety may not use F&R Contractors to complete under Paragraph 4.2 of the Performance Bond, VDE will be in breach of the terms and conditions of the Bond and not only will VDE be waiving its rights under the Bond, but this will also serve to discharge the obligations of the Surety

-5-

thereunder." VDE responded the following week, maintaining that under Paragraph 4.2 of the bond it had the authority to withhold consent to the use of F&R as the completion contractor.

The district court granted summary judgment to St. Paul. The court reasoned that VDE materially breached the bond by insisting that St. Paul could not undertake to complete the project using F&R as completion contractor, contrary to the plain language of Paragraph 4.2, and released St. Paul from its obligations under the bond. The district court dismissed the counterclaims with prejudice.

VDE filed this timely appeal from the judgment.[1]

## II.

VDE contends that the district court erroneously granted summary judgment to St. Paul because, under Paragraph 4 of the bond, St. Paul may not undertake to perform and complete the construction contract through the original contractor without VDE's consent. VDE further argues that even if consent is not ordinarily required by Paragraph 4, it is required where, as here, VDE has alleged that the original contractor acted in bad faith.

Summary judgment is properly granted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of

---

[1] BSPR is not a party to this appeal.

law." Fed. R. Civ. P. 56(c). We review the district court's grant of summary judgment de novo, drawing all reasonable inferences from the facts in the nonmoving party's favor. Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 446 (1st Cir. 2009).

This case arises under our diversity jurisdiction, and therefore we apply Puerto Rico law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). As a general matter, "surety contracts are subject to the same rules of construction as other contracts. The terms of surety obligations, therefore, 'should be interpreted as a whole, and not out of the context of all the other terms.'" In re Sinking of M/V Ukola, 806 F.2d 1, 5 (1st Cir. 1986) (citations omitted) (quoting Martin v. Vector Co., 498 F.2d 16, 23 (1st Cir. 1974)). Under Puerto Rico law, if "'the text of a bond agreement is clear, or the true meaning of its clauses can be easily discerned, the courts should adhere to its text.'" Citibank v. Grupo Cupey, Inc., 382 F.3d 29, 31-32 (1st Cir. 2004) (quoting Caguas Plumbing, Inc. v. Cont'l Constr. Corp., 2001 T.S.P.R. 164, 2001 WL 1618390, at *5 (P.R. Nov. 30, 2001)); see also P.R. Laws Ann. tit. 31, § 3471 ("If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed."). Although "'[t]he prevailing doctrine is that [a surety bond] should be liberally interpreted in favor of its beneficiary,' that principle 'is not a blank check to the judicial power to rule out the pacts

and agreements between the parties.'" Citibank, 382 F.3d at 31 (quoting Luan Inv. Corp. v. Rexach Constr. Co., 2000 T.S.P.R. 182, 2000 WL 1847637, at *5 (P.R. Dec. 8, 2000)). Instead, the principle of liberal construction "applies only where the text of the agreement is ambiguous." Id.

In this case, the text of Paragraph 4 of the bond is unambiguous on the point at issue. Paragraph 4.2, under which the surety assumes primary responsibility for completion of the construction contract, contains no provision requiring the project owner's consent as to the completion contractor. In proceeding under Paragraph 4.2, St. Paul must "[u]ndertake to perform and complete the Construction Contract itself, through its agents or through independent contractors." By its terms, Paragraph 4.2 places no restrictions on whom St. Paul can use to complete the project. See St. Paul Fire & Marine Ins. Co. v. Green River, 93 F. Supp. 2d 1170, 1177 (D. Wyo. 2000), aff'd 6 F. App'x 828 (10th Cir. 2001) (construing identical provision of performance bond and concluding that under Paragraph 4.2, "it is clear that there are no limitations on who St. Paul could utilize to complete the Project"). Paragraphs 4.1 and 4.3, however, both expressly require St. Paul to obtain VDE's consent as to the completion contractor. Under Paragraph 4.1, St. Paul must "[a]rrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract." (Emphasis added.) Similarly, under Paragraph 4.3, St.

Paul is required to "[o]btain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract." (Emphasis added.)

The absence of a consent requirement in Paragraph 4.2, and the presence of such a requirement in Paragraphs 4.1 and 4.3, sensibly reflects the different obligations assumed by a surety electing to proceed under each of these provisions. In choosing to proceed under Paragraph 4.2, which requires the surety to undertake to perform and complete the construction contract, St. Paul "assumed primary responsibility to complete the contract, and with that responsibility came the freedom to assemble the project team of its choosing." Green River, 93 F. Supp. 2d at 1177; see also Richard S. Wisner & James A. Knox, Jr., The ABCs of Contractors' Surety Bonds, 82 Ill. B.J. 244, 246 (1994) (explaining that when a surety elects to take over and complete the project, it directly assumes the contractor's underlying contractual obligation to complete the project). Once the surety has elected to perform under Paragraph 4.2, the surety and the obligee (here VDE) negotiate an agreement, commonly called the "takeover agreement," which is "the critical document for the completing surety and obligee in defining their future rights and obligations and in establishing a clear understanding of the scope of remaining work to be completed." Philip L. Bruner & Patrick J. O'Connor, Jr., 4A

-9-

Bruner & O'Connor on Construction Law § 12:80 (2009). Following negotiation of the takeover agreement, the surety awards a completion contract to a contractor. Id.

In contrast, a surety electing to proceed under Paragraph 4.1 must arrange for the original contractor to perform and complete the construction contract with the owner's consent, by financing the original contractor's continuing performance. See Wisner & Knox, supra, at 245-46. Under this provision, the surety "does not assume primary responsibility for completing the contract, and the owner is required to maintain an ongoing contractual relationship with the terminated contractor." Green River, 93 F. Supp. 2d at 1177; see also Wisner & Knox, supra, at 246. Thus, "[w]hile it makes sense that the owner would have the right to object to such a 'shotgun wedding' to the contractor it just terminated [under Paragraph 4.1], it does not follow that the [owner] would have this right when the surety assumes primary contractual responsibility [under Paragraph 4.2]." Green River, 93 F. Supp. 2d at 1177 (alterations added).

Our interpretation of Paragraph 4.2 is also consistent with common practices in the construction industry. The surety performance options contained in Paragraph 4 of the AIA A312 bond, the bond at issue here, are "standard in the industry." Green River, 93 F. Supp. 2d at 1178; see also Bruner & O'Connor, supra, at § 12:16 (describing the A312 performance bond as "one of the

clearest, most definitive, and widely used type of traditional common law 'performance bonds' in private construction"). It is common practice for a surety undertaking to complete the project itself to hire the original contractor, as St. Paul elected to do here. Wisner & Knox, supra, at 246 (explaining that when the surety elects to take over and complete the construction project, it "does not undertake the construction itself but hires a new contractor, the principal, or the principal's employees under the direction of a consultant"); Bruner & O'Connor, supra, at § 12:80 (stating that "[t]he obligee has no right to unreasonably interfere with the surety's selection of its completion contractor, unless the bond provides otherwise"); Green River, 93 F. Supp. 2d at 1178 ("[I]t is common practice for a surety that elects to perform the project itself to hire the principal's employees under the direction of a consultant. . . .").

VDE's arguments in support of a contrary interpretation of Paragraph 4.2 are unavailing. VDE argues that Paragraph 4.2 is ambiguous as to whether it requires owner consent. VDE contends that the capitalized term "Contractor," as used in Paragraph 4.1, refers to the original contractor, in this case F&R. VDE reasons that the term "agents" as used in Paragraph 4.2 cannot also refer to the original contractor. We do not understand these terms to create any ambiguity. If the surety elects to undertake completion of the contract using F&R as the completion contractor, as

-11-

permitted under Paragraph 4.2, then F&R's role has shifted from that of original contractor to that of agent of the surety.

VDE also suggests that because Paragraph 4.2 neither requires nor expressly dispenses with owner consent, "a well-founded objection to a selected 'agent' prevents its selection and use by the surety." However, the text of the bond does not support this reading. As discussed above, Paragraphs 4.1 and 4.3 both expressly require owner consent as to the completion contractor, while Paragraph 4.2 contains no such consent requirement. We cannot rewrite Paragraph 4.2 to require owner consent in cases where the owner voices a "well-founded objection" to the selected contractor.

VDE further contends that even if Paragraph 4.2 does not ordinarily require that the owner consent to the use of the original contractor as completion contractor, owner consent was required in this case in light of VDE's allegations that F&R acted in bad faith. However, VDE provides no authority for the proposition that F&R's alleged bad faith is in any way relevant to the interpretation of Paragraph 4.2. Paragraph 4.2 places no restrictions on St. Paul's selection of a completion contractor, and does not suggest a different standard for cases in which the owner has alleged bad faith. It is understandable, in light of VDE's allegations of bad faith, that it would be concerned with St. Paul's decision to complete the project using F&R. However, in

-12-

proceeding under Paragraph 4.2, St. Paul assumes primary responsibility to complete the construction contract. In the event that St. Paul fails to meet its obligations to complete the contract, VDE has a remedy against St. Paul.

### III.

We conclude, as the district court did, that VDE materially breached the bond by insisting that St. Paul could not employ F&R as completion contractor under Paragraph 4.2. <u>See</u> <u>Green River</u>, 93 F. Supp. 2d at 1179 (holding that owner's refusal to allow surety to complete construction under Paragraph 4.2 using employees of original contractor was material breach of performance bond). This breach discharged St. Paul from its obligations to perform under the bond. P.R. Laws Ann. tit. 31, § 3052.[2]

<u>Affirmed</u>.

---

[2] In light of our conclusion, we need not address St. Paul's contention that there are additional, independent grounds for affirming summary judgment in its favor.