KETTLE BROOK LOFTS, LLC vs. SPECHT, 100 Mass. App. Ct. 359

 
 KETTLE BROOK LOFTS, LLC, & others [Note 1] vs. STACY S. SPECHT & others [Note 2] (and a companion case [Note 3]).

100 Mass. App. Ct. 359
 April 13, 2021 - October 12, 2021

Court Below: Superior Court, Suffolk County
Present: Meade, Wolohojian, & Massing, JJ.

 

Amended December 10, 2021.

Condominiums, Development rights, Master deed, Common area. Real Property, Condominium, Mortgage. Mortgage, Priority, Partial release, Discharge.

A developer who had reserved a right to construct a condominium in phases over a limited period of time could not, consistent with the Massachusetts condominium statute, G. L. c. 183A, and the master deed at issue, unilaterally extend its time to complete the phased development for another seven years [366-369]; moreover, the developer's attempt to add additional units by recording amendments to the master deed just before its phasing rights had expired was invalid, where the units the developer sought to add were not "substantially complete" on the date that the amendments were recorded, as required by the master deed [369-371]; finally, although the developer's lenders had executed partial releases of their mortgage interests to individual unit owners, they had not thereby effectively released their entire interest in the common areas of the condominium, where the developer had not sold one hundred percent of the completed units; thus, this court declared that the lenders' mortgage interests had not been subordinated to the master deed as to the units retained by the developer and those units' undivided percentage interest in the condominium's common areas [371-374].

CIVIL ACTION commenced in the Superior Court Department on August 3, 2015.

CIVIL ACTION commenced in the Land Court Department on August 6, 2015. 

 Page 360 

 After transfer of the Superior Court action to the Land Court Department, the cases were heard by Karyn F. Scheier, J., on motions for summary judgment; a renewed motion for summary judgment was heard by Diane R. Rubin, J., and entry of judgment was ordered by her. 

 Henry A. Goodman for Kettle Brook Lofts, LLC, & others.

 Patrick C. Tinsley for Haymarket Capital, LLC, & another.

 Thomas O. Moriarty for Stacy S. Specht & others.

 MASSING, J. In this appeal we consider the scope of a developer's reserved right to construct a condominium in phases over a limited period of time and whether, consistent with the terms of the Massachusetts condominium statute, G. L. c. 183A (statute), and the master deed, the developer may unilaterally extend its time to complete the phased development. In the circumstances of this case, we hold that the developer's attempts to do so were invalid under both the statute and the master deed and affirm the judgment in this regard. We also consider whether the developer's lenders, by executing partial releases of their mortgage interests to individual unit owners, effectively released their entire interest in the common areas of the condominium. Distinguishing Trustees of the Beechwood Village Condominium Trust v. USAlliance Fed. Credit Union, 95 Mass. App. Ct. 278 (2019) (Beechwood), because the developer here had not sold one hundred percent of the completed units, we modify the judgment to declare that the lenders' mortgage interests continue to encumber the units retained by the developer and those units' undivided percentage interest in the condominium's common areas.

 Background. 1. The master deed. The undisputed facts in the parties' summary judgment motions established the following. From 2004 to 2008, Kettle Brook Lofts, LLC (developer), acquired several tracts of land located at 1511 and 1541 Main Street in Worcester (property). The property included a single structure with six adjoining wings. As pertinent here, Haymarket Capital, LLC (Haymarket), and Commerce Bank and Trust Company (Commerce Bank) made loans to the developer, secured by mortgages and security agreements, to develop the property and structure as a condominium. (For simplicity, we refer to Haymarket and Commerce Bank collectively as "the lenders," and to their various security arrangements as "mortgages.")

 Following the execution of the mortgages, the developer, as the "declarant," recorded a master deed on July 22, 2008, creating the Kettle Brook Lofts Condominium (condominium). By the terms

 Page 361 

 of the master deed, all the developer's interests in all the land and improvements at the property were submitted to the provisions of G. L. c. 183A. As described in more detail below, the master deed permitted the developer to complete construction of up to 109 units in phases over a period of seven years. At the time the master deed was recorded, "Wing C," with thirty-three units, had been completed as "Phase I." Exhibit C to the master deed (Exhibit C) listed the thirty-three units in Wing C along with their size, description, and assigned percentage of undivided beneficial interest in the common areas, based on each unit's fair market value in relation to the aggregate value of all then-existing units. The thirty-three units' percentage ownership of the common areas totaled one hundred percent. The contemplated future units were to be located in "the additional wings shown on the Plans as Wing A, Wing B, Wing C, Wing D, Wing E, and Wing G," which, the master deed noted, "presently constitute common areas and . . . may be completed as additional phases." 

 Several sections of the master deed set forth the developer's rights and obligations with respect to the phased development of the condominium. In section IV, entitled "Phasing," the developer as declarant "reserve[d] the right, but not the obligation, to complete the construction of the Condominium, or any part thereof, by amending this Master Deed, which right is also specifically reserved, in order to add up to five (5) additional phases." If fully completed, the condominium would include a total of 109 units, consistent with a special permit previously obtained from the Worcester planning board. "[T]o complete construction work on the Condominium," the developer reserved "the easement, license right and privilege to store equipment and materials and to pass and re-pass by vehicle and on foot in, upon, over and to any and all of the common areas and facilities" of the condominium "for a period ending 7 years" after the recording of the master deed. 

 Section VIII, "Declarant's Reservation of Development Rights," similarly reserved the right, but did not require, the developer "to construct and add to the Condominium the total permitted 109 Units." This provision established a seven-year period for the developer to substantially complete the additional phases, and also provided that the developer's failure to complete any additional phases within that time would constitute a waiver of its development rights: 

"In the event that additional phases are to be included in the 

 Page 362 

Condominium, the Units to be added shall be substantially completed, and the amendment to the Master Deed submitting those Units to the condominium shall be recorded on or before 7 years from the date of the recording of this Master Deed. In the event that any such phase has not been completed and any such amendment has not been recorded during the period specified in the preceding sentence, the Declarant shall be deemed to have waived the right to complete said phase[,] to record such an amendment to submit additional Units to the Condominium, or to execute documents pursuant to [section] XI(c) hereof." 

In section XI(c), referenced in the above-quoted excerpt from section VIII, the developer again reserved its phasing rights and further reserved the right, "when such improvements are substantially completed," to amend the master deed, without the consent of the existing unit owners or their mortgagees, to reflect the addition of new units and to reapportion all new and existing units' percentage of beneficial interest in the common areas. The same paragraph provided that unit owners, by recording their deeds or mortgages, would "acknowledge the anticipated future phases of the Condominium resulting in a potential total of 109 Units," and consent to the corresponding diminution in their percentage ownership of the common areas that the addition of new units would necessarily cause.

 At the same time the master deed was recorded, and consistent with its terms, the developer filed a declaration of trust establishing the Kettle Brook Lofts Condominium Trust (trust), through which the unit owners would manage and regulate the condominium. The developer was the original trustee of the trust. 

 2. Early phases of development. The developer quickly added eighteen units in "Wing B" as Phase II and two units in "Wing G" as Phase III, amending the master deed accordingly. The addition of the Wing B units was reflected in the first amendment to the master deed, recorded just one week after the recording of the master deed itself. The addition of the units in Wing G was reflected in the third amendment, recorded about six weeks later. Each of the amendments included an updated version of Exhibit C, listing all completed units and their corresponding percentage interest in the common areas based on their relative fair market value. Thus, Exhibit C to the third amendment listed fifty-three units, with combined percentage interests in the common areas 

 Page 363 

totaling 100 percent. [Note 4] 

 Over time, the developer sold forty-eight of the units. For all units sold, the lenders executed partial releases, releasing to the buyers of the units "all interest acquired" under the lenders' mortgages with respect to those individual units. The developer retained title to the five unsold units. In 2014, Stacy Specht and Sudhakar Teegavarapu were duly appointed as trustees of the trust. 

 3. The developer's attempts to reassert its rights. As noted, the master deed required the developer to complete the phased development of the condominium in seven years. However, no new units were added after the first two months of the condominium's existence. On July 21, 2015, the day before the developer's phasing rights were to expire, the developer unilaterally recorded a series of instruments that purported to vastly expand its ownership rights and powers over the development and governance of the condominium. In the fifth amendment to the master deed, the developer purported to amend the phasing provisions of the master deed to give itself an additional seven years to complete the "Phase IV" development of the last fifty-six of the permitted 109 units. The developer invoked the general amendment provision of the master deed, section XI(a), as its authority to make amendments without the consent of the other unit owners or trustees. [Note 5] 

 The units to be created in Phase IV -- which, the developer acknowledged in the fifth amendment, would "require additional work before certificates of occupancy will be issued by the City of Worcester" -- were designated "Class B" units to be governed under a separate trust, the "Kettle Brook Lofts Class B Condominium Trust" (trust B), recorded concurrently. The developer

 Page 364 

 gave itself the "sole, unfettered right to re-arrange Phases and sizes and numbers of Phases at its discretion," including creating phases within Phase IV. The fifth amendment provided that when the developer finally completed the development and "no longer own[ed] any of the Class B Units," the Class B units would be merged into the trust. The developer also designated the Class B units as members of the trust "solely for voting purposes" until they no longer had Class B status. 

 Simultaneously, the developer recorded a sixth amendment that, among other things, purported to add the fifty-six additional Phase IV units to the condominium -- forty-three in "Wing A," ten in "Wing D," and three in "Wing E." Although these units were only partially built, the developer recited in the sixth amendment that construction was "substantially completed." In amended Exhibit C, now listing 109 units, the developer allocated over sixty percent of the ownership interest in the common areas to the newly added, uninhabitable Phase IV units. With the addition of the Phase IV units, the developer purported to control more than seventy-five percent of the beneficial interest in the condominium. It exercised its newly-minted controlling interest to remove the then-serving trustees, Teegavarapu and Specht, and to appoint itself as their successor. [Note 6] 

 4. The litigation. Sixteen days after the developer recorded the instruments described above, it commenced an action in the Superior Court against the trustees and all unit owners seeking to enjoin the trustees from acting as trustees, from controlling funds of the trust, and from interfering with the developer's development of Phase IV, and seeking an order authorizing the developer to act as trustee of the trust and of trust B. Three days later, the trustees commenced an action against the developer in the Land Court seeking to invalidate the instruments recorded by the developer on July 21. The trustees sought declaratory relief to the effect that the developer's reserved development rights had expired and that its attempts to extend those rights, to add the additional units to the condominium as Phase IV, to remove the trustees, and to create trust B to govern Phase IV of the condominium were invalid.

 Page 365 

 The trustees later amended their complaint in the Land Court action, naming the lenders as codefendants and seeking a declaration that they had released their entire interest in the condominium's common areas such that their mortgages, though recorded prior to the master deed, were now subordinate to it. The developer filed an answer and counterclaim in the Land Court action seeking essentially the same relief that it had sought in its Superior Court action. 

 The Superior Court case was transferred to the Land Court and the two matters were heard together. On cross motions for summary judgment, a Land Court judge declared that the developer's phasing rights had expired on July 22, 2015, and that its attempt to extend those rights for an additional seven years in the fifth amendment to the master deed was invalid. The judge also concluded that the provisions of the fifth and sixth amendments purporting to add the Phase IV units were invalid and of no effect. The judge, however, declined to rule on the status of the lenders' mortgages, finding that the issues were not ripe for summary judgment. 

 After the parties conducted further discovery, a second Land Court judge considered the trustees' renewed motion for summary judgment on the status of the lenders' mortgages. The second judge concluded that all parts of the property that had not been sold were common areas and, because the lenders had released their entire interest in the common areas, their mortgages were subordinate to the master deed. After judgment entered declaring all of the above, the developer and the lenders appealed. 

 Discussion. "Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Boazova v. Safety Ins. Co., 462 Mass. 346, 350 (2012), citing Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002), and Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). "In a case like this one where both parties have moved for summary judgment, the evidence is viewed in the light most favorable to the party against whom judgment [has entered]." Boazova, supra, quoting Albahari v. Zoning Bd. of Appeals of Brewster, 76 Mass. App. Ct. 245, 248 n.4 (2010). Our review is de novo. Boazova, supra.

 This appeal turns solely on questions of law -- primarily the application of the Massachusetts condominium statute and the construction of the terms of the master deed. See Beechwood, 95 Mass. App. Ct. at 284-285. "General Laws c. 183A is essentially

 Page 366 

 an enabling statute, setting out a framework for the development of condominiums in the Commonwealth, while providing developers and unit owners with planning flexibility." Queler v. Skowron, 438 Mass. 304, 312 (2002). The statute sets forth certain baseline requirements for establishing condominiums, and "those matters that are not specifically addressed in the statute are to be worked out by the involved parties." Id. at 312-313. Thus, "[t]he master deed sets forth the nature of the property interest being conveyed, describes the land, buildings, units, and common areas of the condominium, sets forth the purposes for and use restrictions on said buildings and units, and describes the method by which the master deed may be amended." Id. at 311. "So long as the statutory minimum is met, . . . 'the master deed itself provides "the rules of the game."'" Beechwood, supra at 285, quoting Flynn v. Parker, 80 Mass. App. Ct. 283, 289 (2011). 

 1. Developer's attempt to extend its phasing rights. "In a phased condominium development, groups or stages of units are completed over a period of several years and become part of the condominium by successive amendments to the master deed." Podell v. Lahn, 38 Mass. App. Ct. 688, 689 n.3 (1995). When a condominium is developed in phases, the individual unit owners' percentage of the undivided interest in the common areas [Note 7] decreases over time. The general rule, set forth in G. L. c. 183A, § 5, is that such reductions cannot be made without the consent of the affected unit owners. Since 1998, to facilitate phased developments, the statute has specifically allowed such alterations to take place without express consent if they are set forth in the master deed when the unit is purchased such that the purchaser is on notice of the changes in its ownership interests that may occur:

"The percentage of the undivided interest of each unit owner in the common areas and facilities as expressed in the master deed shall not be altered without the consent of all unit owners whose percentage of the undivided interest is materially affected . . . ; provided, however that the acceptance and recording of the unit deed shall constitute consent by the

 Page 367 

 grantee to the addition of subsequent units or land or both to the condominium and consent to the reduction of the undivided interest of the unit owner if the master deed at the time of the recording of the unit deed provided for the addition of units or land and made possible an accurate determination of the alteration of each unit's undivided interest that would result therefrom" (emphasized language inserted by St. 1998, c. 242, § 5). 

G. L. c. 183A, § 5 (b) (1).

 Consistent with the statute, the master deed provided that the developer could develop, in phases over a period of seven years, as many as 109 units, and that by accepting and recording their unit deeds, the unit owners consented to these additional phases of development and corresponding diminution in their percentage ownership of common areas. At issue in this appeal is whether the developer's attempt to extend the phased development for another seven years violated the statute or the provisions of the master deed. The first Land Court judge concluded that the developer's actions violated both. We agree.

 Under § 5 (b) (1) of the statute, the terms of the master deed "at the time of the recording of the unit deed" govern whether the unit owners' consent is required to reduce their percentage of undivided interest in the common areas. Here, when the unit owners recorded their deeds, the master deed provided that the developer's phasing rights would expire seven years from the date the master deed was recorded, that is, on July 22, 2015. Thus, each unit owner accepted that construction of additional units could be ongoing until that time, and that their percentage interest in the common areas could be shared with up to 108 other units. In statutory terms, the master deed allowed the purchasers of the units to make "an accurate determination of the alteration of each unit's undivided interest that would result" as phases were added. G. L. c. 183A, § 5 (b) (1). They could also make an accurate determination when their exposure to such changes, without their consent, would come to an end. The unit owners "had a right to rely" on the phasing provisions of the master deed at the time they acquired their units. Suprenant v. First Trade Union Sav. Bank, FSB, 40 Mass. App. Ct. 637, 638 (1996).

 In Suprenant, 40 Mass. App. Ct. at 637, 640, as here, prior to the expiration of the declarant's phasing rights, the master deed was amended to extend the period in which new units could be added. A Land Court judge ruled, and this court agreed, that the

 Page 368 

 attempt to extend the duration of the phasing rights without the approval of all affected unit owners "circumvent[ed]" the requirements of the statute. [Note 8] Id. at 641. "The reserved right to add additional phases (and to amend the master deed accordingly, . . . without approval of any unit owner) was limited under [the master deed] to a period of seven years after the recording of the master deed." Id. When additional phases were not added "by the time the reserved right expired (together with the [unit owners'] concomitant agreement to reduction in [their] percentage interest), the [unit owners'] percentage interest became fixed." Id. "Any subsequent attempt . . . to add phases affecting the unit owners' percentage interests required, under G. L. c. 183A, § 5 (b), one hundred percent approval of all owners whose percentage interests were affected." Id.

 Suprenant stands for the proposition that the master deed fixes the parties' expectations not only as to the number of units that the declarant may add, but also as to the duration of the phasing period. Although Suprenant was decided before the statute was amended in 1998 to facilitate and regulate phased development of condominiums, the statute as amended does not overrule Suprenant or authorize the extension of phasing rights in the manner that the developer here attempted. [Note 9] Under the statute as amended, the extent and duration of phasing rights, and how the addition of new units might affect the ownership rights of existing unit owners, must be set forth with clarity in the master deed. Unit owners have the right to rely on the scope and duration of the declarant's phasing rights as expressed in the master deed "at the time of the recording of the unit deed." G. L. c. 183A, § 5 (b) (1). Thus, we reject the developer's contention that the general amendment provision of the master deed, section XI(a), gave it the authority unilaterally to extend its phasing rights -- or any suggestion that the unit owners implicitly consented to such a use of the general amendment provision. Without the consent of all affected unit owners, any attempt to extend the scope or duration

 Page 369 

 of the phasing provisions of the master deed would violate the statute. We do not rule out the possibility that a master deed could be crafted to give the declarant the ability to extend its phasing rights, but under § 5 (b) (1), such a provision would have to be written with sufficient specificity to allow the unit owners to make "an accurate determination" of the scope of the declarant's power in this regard at the time they purchased their units. Here, the developer's attempt to extend the period to complete the phased development of the condominium did not comply with § 5 (b) (1).

 We also agree with the first judge that the general amendment provision itself, which requires that amendments by the developer "shall not substantially increase the burdens of any Unit Owner, or substantially decrease the benefits conferred upon any Unit [O]wner," precluded an amendment extending the duration of the developer's phasing rights. The current unit owners' percentage interest in the common areas became fixed seven years after the recording of the master deed. Suprenant, 40 Mass. App. Ct. at 641. The addition of new units thereafter would decrease the benefits associated with the existing units.

 2. Developer's attempt to add Phase IV units. Alternatively, the developer argues that it did not need to extend its phasing rights because it effectively added the additional fifty-six units in Phase IV by recording the fifth and sixth amendments to the master deed just before its phasing rights had expired. The judge determined, however, that the fifth and sixth amendments were invalid and did not effectively add the Phase IV units to the condominium.

 The master deed provides that before future phases may be added to the condominium, they must be "substantially complete" and "of the same quality of construction and materials" as the original thirty-three units. The developer argues that the term "substantially complete" is vague, and whether that standard was met could not be decided on summary judgment. We disagree. "In interpreting a deed, as with any contract, we 'must construe all words that are plain and free from ambiguity according to their usual and ordinary sense.'" Beechwood, 95 Mass. App. Ct. at 284, quoting Boston Redev. Auth. V. Pham, 88 Mass. App. Ct. 713, 717 (2015). Although the master deed did not define "substantially complete," the term is well understood in the context of construction of real property to refer to a state in which the property is ready to be used for its intended purpose, in this case, residential occupancy. For example, in the mechanic's lien statute,

 Page 370 

 "substantial completion" is defined as when work "is sufficiently complete so that it can be occupied or utilized for its intended use." G. L. c. 254, § 2A. Similarly, the "retainage" statute, governing the withholding of payments to ensure performance of construction contracts, defines "substantial completion" as when work is sufficient "so that the project owner may occupy or utilize the work for its intended use." G. L. c. 149, § 29F. And without defining the term, the statute of repose for tort actions arising from improvements to real property equates "substantial completion" with "the taking of possession for occupancy by the owner." G. L. c. 260, § 2B. 

 Here, under no reasonable interpretation of the term could the units have been considered "substantially complete" on the date that the fifth and sixth amendments were recorded. While exterior walls, windows, studs for individual rooms, and rough wiring were complete, none of the units had doors, completed electrical or plumbing systems, sheetrock, or any other finishes. In the fifth amendment itself the developer conceded that additional work was necessary before the units would become eligible for occupancy. And by reserving for itself an additional seven years to complete the development of the remaining units, the "right to re-arrange Phases and sizes and numbers of Phases at its discretion," and the right to create phases within Phase IV, the developer all but explicitly admitted that the units were not substantially complete. 

 We are not persuaded that the filing of a registered architect's certificate that the floor plans submitted with the sixth amendment "fully and accurately depict the layout, location, unit number and dimensions of the units as built," as required by G. L. c. 183A, § 8 (f), created a factual dispute as to whether the units were substantially complete. Section 8 (f) describes the nature of floor plans required to be included in the master deed; it does not address whether the units depicted are "substantially complete." Even the architect who signed the plans testified at his deposition that he did not consider the units "substantially complete." The developer "ha[d] no reasonable expectation of proving," Kourouvacilis, 410 Mass. at 716, that the Phase IV units were substantially complete when it recorded the fifth and sixth amendments. Because the units were not substantially complete, the amendments purporting to add the units to the condominium were invalid. It follows that the developer's creation of trust B and its attempt to remove the trustees and ratify the extension of its phasing rights, all of which depended on the extension of voting

 Page 371 

 rights to the Phase IV units, were also invalid. [Note 10] 

 3. Status of lenders' mortgages. The lenders appeal from the second judge's declaration that, by executing partial releases with respect to forty-eight of the existing fifty-three units, the lenders released all of their mortgage interests in the common areas of the condominium, rendering their mortgages subordinate to the master deed. As the judge noted, the effect of the declaration was that the existing unit owners owned the common areas -- including the unfinished units -- free and clear of the lenders' prior recorded mortgages. The lenders contest the declaration on two grounds. First, they argue that the unfinished units were never submitted to the provisions of the condominium statute and therefore remain the sole property of the developer. Second, they contend that their partial releases did not release the totality of their mortgage interests in the common areas. While we agree with the judge that the entire property, including the unfinished units, was submitted to the statute, we agree with the lenders that they did not release one hundred percent of their mortgage interests, as they retained mortgage interests in the five unsold units and in those units' undivided percentage interest in the condominium's common areas.

a. Unsold sections of the building. "A condominium is created by a 'declarant' who records a master deed that 'submits' land to the provisions of G. L. c. 183A." Queler, 438 Mass. at 311. The declarant may, in the master deed or by a separate instrument, retain interests in the property that never become part of the condominium subject to c. 183A, see Beaconsfield Towne House Condominium Trust v. Zussman, 416 Mass. 505, 508 (1993), or become part of the condominium but are subject to reversion upon the occurrence of an event, see Queler, supra at 311-316 (provision in master deed that if declarant did not complete phased development within seven years, undeveloped land would be removed from provisions of statute and revest in declarant, effective and permissible under c. 183A).

The opening paragraph of the master deed recited the developer's intent to submit the entire property, consisting of land, buildings and improvements, and all associated rights, to the provisions of c. 183A. The master deed's definitions of land and

 Page 372 

buildings in section III were equally broad. The building submitted included the single finished wing and all unfinished wings. Finally, the description of the common areas in section VI included not only "the entire property described on Exhibit 'A' of this Master Deed," but also "all parts of the buildings as described in [section] III of this Master Deed, other than the Units described on Exhibit 'C' hereto." That is, the master deed carved out from the common areas the specific units that had been completed, but provided that the unfinished units would be part of the common areas until the developer exercised its reserved right to amend the master deed to create new units. "We think it clear from the language of the master deed . . . that the developer intended the entire . . . parcel to constitute the condominium along with the extant initially constructed buildings and improvements in [Phase I]." DiBiase Corp. v. Jacobowitz, 43 Mass. App. Ct. 361, 364 (1997), S.C., 427 Mass. 1004 (1998). The units that the developer intended to add in future phases "would be constructed on land already submitted to c. 183A, i.e., on common area land." Id. 

 Notwithstanding the broad language submitting everything but the completed units to the provisions of c. 183A as common areas, for the first time on appeal the lenders point to one sentence in one subsection of section VI, defining the common areas, as excluding the unfinished units. This sentence reads, "Until such time as such Amendment [adding new units] is recorded at the Registry of Deeds any portion of said building or real property not specifically labeled as either an individual Unit, or common area shall remain the sole property of the Declarant." Because the lenders never brought this language to the judge's attention, this argument is waived. See USF Ins. Co. v. Langlois, 86 Mass. App. Ct. 44, 47 (2014). 

 In any event, the quoted language does not clearly reserve to the developer ownership of the unfinished units. Contrast Queler, 438 Mass. at 312 (provision in master deed sufficient to manifest "clear intent of the declarants . . . not to 'submit' to G. L. c. 183A an estate of fee simple absolute, but rather to submit a defeasible fee"). Given that the master deed explicitly labeled the unfinished wings as common areas -- stating that the "structure . . . includes . . . the additional wings shown on the Plan as Wing A, Wing B, Wing C, Wing D, Wing E, and Wing G which presently constitute common areas and which may be completed as additional phases" -- it is clear that "any portion of said building or real property not specifically labeled as either an individual Unit,

 Page 373 

 or common area" does not refer to the unfinished wings. As the second judge concluded in a different context, "Since the Master Deed does not distinguish between finished and unfinished buildings and categorizes all building components (other than the units) as common area, the partially constructed buildings must necessarily be common area." If this interpretation renders a sentence of the master deed superfluous, that result is preferred to an interpretation that conflicts with the general object and meaning of the master deed as a whole and of c. 183A. See Wolfe v. Gormally, 440 Mass. 699, 704 (2004); Worcester Mut. Ins. Co. v. Marnell, 398 Mass. 240, 245 (1986). Moreover, "[t]he language of the deed is 'construed most strongly against' the grantor, in this case, the developer." Beechwood, 95 Mass. App. Ct. at 289, quoting Estes v. DeMello, 61 Mass. App. Ct. 638, 642 (2004). See, e.g., Bernard v. Nantucket Boys' Club, Inc., 391 Mass. 823, 827 (1984), quoting Melvin v. Proprietors of the Locks & Canals on Merrimack River, 5 Met. 15, 27 (1842) ("If, therefore, there be two descriptions of the land conveyed, which do not coincide, the grantee is entitled to hold by that which will be most beneficial to him"). 

 Because the developer did not reserve any of the common areas from submission to c. 183A, upon expiration of the developer's phasing rights, the portions of the common areas that had not been transformed into units remained the property of "the unit owners as tenants in common in proportion to their respective undivided interests." DiBiase Corp., 43 Mass. App. Ct. at 366.

 b. Effect of partial releases. As the forty-eight units in Phases I through III were sold, the lenders executed releases of "all their interest" in the individual units. Under G. L. c. 183A, § 5 (b) (1), "[t]he percentage of the undivided interest in the common areas and facilities shall not be separated from the unit to which it appertains, and shall be deemed to be conveyed or encumbered with the unit even though such interest is not expressly mentioned or described in the conveyance or other instrument." Accordingly, the lenders' releases of individual units also released from the mortgages the unit owners' percentage of the undivided interest in the common area. See Beechwood, 95 Mass. App. Ct. at 286. 

 However, because five completed units remained unsold and continued to be owned by the developer, the lenders did not release one hundred percent of their mortgage interests in the common areas. This fact distinguishes this case from Beechwood,

 Page 374 

 95 Mass. App. Ct. at 281 & n.10, in which the first phase of the development included only three units, each of which was sold and held a one-third interest in the common areas. Thus, when the mortgagee "executed partial discharges of the first three units, he also released each of the three units' appurtenant undivided one-third interest in the common area," which amounted to the whole common area. Id. at 288. Here, by contrast, the lenders did not release the entirety of the common areas and facilities; indeed, the second motion judge recognized that the developer "ha[d] not yet sold the remaining five units and those may continue to be encumbered by the Mortgages." 

 Although the lenders released their mortgages with respect to a significant percentage of the common areas, the mortgages continue to encumber the Phase I-III units that the developer retained and those units' percentage interest in the common areas. These rights, having never been released, have not been subordinated to the master deed. However, the mortgages are superior to the master deed only with respect to the portion of the mortgaged property that has not been released -- the unsold units (and their associated undivided percentage interest in the common areas). The units previously sold and released from the mortgages (and their associated interests in the common areas) are free of the lenders' interests. Accordingly, should the lender foreclose on any or all of the encumbered units, such a foreclosure would not extinguish the master deed or the condominium regime it created. [Note 11]

 Conclusion. The fourth and fifth declaration paragraphs of the judgment shall be amended by inserting after "Declaration of Trust" the following: "except with respect to the portions of the property comprising unsold Phase I, II, and III units owned by Kettle Brook Lofts, LLC, and those units' undivided percentage interest in the Condominium's common areas, as to which the mortgage deed continues to encumber."

The sixth declaration paragraph of the judgment shall be amended by inserting after "Declaration of Trust" the following: "except with respect to the portions of the property comprising unsold Phase I, II, and III units owned by Kettle Brook Lofts, LLC, and those units' undivided percentage interest in the Condominium's 

 Page 375 

common areas, which the mortgage deed and the First Amendment to Security Agreement continue to encumber."

The seventh declaration paragraph of the judgment shall be amended by inserting before "the fee interest in the premises" the following: ", with the exception of the portions of the property comprising the Phase I, II, and III units of the Condominium,".

 As so amended, the judgment is affirmed. [Note 12]

 So ordered.

FOOTNOTES
[Note 1] Kettle Brook Lofts Condominium Trust and Kettle Brook Lofts Class B Condominium Trust. 

[Note 2] Sudhakar Teegavarapu; Marc Surette, doing business as Empire Property Professionals; and all other owners of units at Kettle Brook Lofts Condominium. The appellants did not seek any relief with respect to Surette and make no argument as to him on appeal. 

[Note 3] Trustees of the Kettle Brook Lofts Condominium Trust vs. Kettle Brook Lofts, LLC; Commerce Bank and Trust Company; and Haymarket Capital, LLC. 

[Note 4] The second and fourth amendments to the master deed were recorded to make minor changes to the descriptions of individual units. These amendments did not affect any unit's percentage interest in the common areas. 

[Note 5] Section XI(a) provided in full: 

"While the Declarant owns any Unit in the Condominium or during any time in which the Declarant retains the right to add in additional Units pursuant to unexercised development or phasing rights, the Declarant shall have the right, at any time, to amend this Master Deed without the consent of any other Unit Owners or any of the Trustees of the Condominium Trust, provided, however that any such amendment shall not substantially increase the burdens of any Unit Owner, or substantially decrease the benefits conferred upon any Unit [O]wner." 

[Note 6] The developer also used its newly acquired voting power to ratify the extension of its phasing rights in the fifth amendment under section XI(b) of the master deed, which permitted amendments to be made by a supermajority of the unit owners, in the event that the invocation of its unilateral amendment power under section XI(a) was ineffective. 

[Note 7] "Ownership of a condominium unit is a hybrid form of interest in real estate, entitling the owner to both 'exclusive ownership and possession of his unit, G. L. c. 183A, § 4, and . . . an undivided interest [as tenant in common together with all the other unit owners] in the common areas.'" Berish v. Bornstein, 437 Mass. 252, 262 (2002), quoting Noble v. Murphy, 34 Mass. App. Ct. 452, 455-456 (1993). 

[Note 8] The amendment was approved by seventy percent of the unit owners. Suprenant, 40 Mass. App. Ct. at 637, 640. 

[Note 9] By contrast, the statute gives the organization of unit owners, through its governing body, the authority to extend the duration of phased development as originally set forth in the master deed. See G. L. c. 183A, § 5 (b) (2) (iii) (providing that organization of unit owners, with consent of specified percentage of unit owners and holders of first mortgages, may "[e]xtend, revive or grant rights to develop the condominium . . . even if the time period for adding land, units or common facilities . . . has expired"). 

[Note 10] We also agree with the first judge that the general amendment provision of the master deed did not authorize the developer's amendments that added the Phase IV units, gave them voting power, and allowed them to enjoy existing common areas without payment of condominium fees, as these provisions either increased the burdens or decreased the benefits of the existing unit owners. 

[Note 11] Given the result we reach, we need not address the lenders' claim that subordinating their entire interest in the common areas to the master deed would amount to unjust enrichment, entitling them to restitution from the unit owners, or would be barred by the doctrine of unclean hands. 

[Note 12] The trust's requests for attorney's fees are denied. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.