# United States Court of Appeals
## For the First Circuit

No. 21-1126

ARCH INSURANCE COMPANY,

Plaintiff, Appellee,

v.

THE GRAPHIC BUILDERS LLC,

Defendant, Appellant,

RCM MODULAR, INC.,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Thompson, Lipez, and Kayatta,
Circuit Judges.

Richard E. Briansky, with whom Eckert Seamans Cherin &
Mellott, LLC and Peckar & Abramson, P.C. were on brief, for
appellant.

Jonathan C. Burwood, with whom Watt, Tieder, Hoffar &
Fitzgerald, LLP was on brief, for appellee.

June 1, 2022

**LIPEZ**, **Circuit Judge**.  In this diversity case, The Graphic Builders LLC ("Graphic"), a general contractor, is seeking to enforce a performance bond issued by Arch Insurance Co. as surety for a subcontractor hired to work on a major project for Graphic.  Arch, however, claims that Graphic breached the terms of the performance bond, and it seeks a judgment declaring that it has no liability under the bond.  The district court sided with Arch, concluding that Graphic was required to terminate the subcontractor as a condition of seeking performance from Arch but had not done so.  See Arch Ins. Co. v. Graphic Builders LLC, 519 F. Supp. 3d 54, 60-61 (D. Mass. 2021).  Accordingly, the court granted summary judgment for Arch.

On appeal, Graphic argues that the district court erred in concluding that Arch's obligation to provide the warranty performance it seeks was conditioned on termination of the subcontractor.  Graphic asserts that both the bond's language and relevant precedent support its position.  We disagree and therefore affirm the district court's judgment.

**I.**

When reviewing a grant of summary judgment, we consider the facts in the light most favorable to the nonmoving party.  See, e.g., Modeski v. Summit Retail Sols., Inc., 27 F.4th 53, 56 (1st Cir. 2022).  In this case, there is no material disagreement about the facts, which we set forth below.  Graphic and Arch debate only

whether those facts give rise to Arch's obligations under the performance bond.

In 2017, Graphic was hired for a construction project in Charlestown, Massachusetts, that consisted of converting an existing commercial building to loft-style apartments and constructing a four-story apartment building on the same property. Graphic and the property owner agreed on a modular method of construction for the new building, and Graphic then selected an experienced modular manufacturer, RCM Modular, Inc., to fabricate and assemble the structure at a cost of about $8.6 million. Among the obligations included in the subcontract was a "Special Manufacturers [sic] Warranty" for the modular units' windows and doors.[1]

A performance bond issued in conjunction with the subcontract rendered Arch, as surety, "jointly and severally" responsible for RCM's obligations. Section 3 of the bond, which is reproduced in Section II below, specifies the actions by Graphic

_____

[1] Graphic asserts in its brief that Arch was obliged "to issue a post-completion window warranty and other warranties," but it does not specify what "other warranties" are at issue. At oral argument, Graphic's counsel stated that only the window warranty is at issue. Following Graphic's lead, we focus on the window warranty and consider waived any assertion that a different analysis would apply to "other warranties."

that would trigger Arch's "obligation under th[e] Bond," including declaring RCM in default and terminating the subcontract.[2]

Shortly after RCM delivered the modular units to Graphic in May 2018, Graphic complained to RCM that the units were defective. Graphic reported that, among other issues, the windows leaked and the exteriors of the modules were misaligned. In a letter to Arch recounting the sequence of events that followed its initial complaints, Graphic reported that it had received "no meaningful response from RCM." It therefore "engaged in remedial efforts to correct the defectively delivered and installed modules."[3] Issues remained, however, and Graphic and RCM met at the project site in September 2018 to "develop[] a remediation plan to correct the defective work[,] including producing the window manufacturer's warranty." According to Graphic, "RCM

---

[2] Arch's performance bond is in a standard format commonly used in the construction industry and known as an American Institute of Architects A312 Performance Bond (2010 ed.). See, e.g., St. Paul Fire & Marine Ins. Co. v. VDE Corp., 603 F.3d 119, 124 (1st Cir. 2010) (noting that a leading commentator on construction law has described the A312 performance bond as "one of the clearest, most definitive, and widely used type of traditional common law 'performance bonds' in private construction" (quoting Philip L. Bruner & Patrick J. O'Connor, Jr., 4A Bruner & O'Connor on Construction Law § 12:16 (2009))).

[3] Although the record is somewhat unclear on this point, it appears that a substantial amount of the remedial work was done by third-party subcontractors hired by Graphic but that RCM itself was asked to address the window deficiencies.

- 4 -

failed to complete the remediation plan," and the manufacturer refused to provide a warranty.

There followed a series of letters from Graphic to RCM and Arch, initially providing notice only of RCM's potential default and then, on April 30, 2019, notifying RCM and Arch of RCM's default. The April 30 letter stated that Graphic was declaring RCM in default because, among other reasons, it had failed to deliver a window warranty and had not "undertake[n] remedial steps to defectively rendered Work and forc[ed] Graphic to do so at its own expense." Graphic noted, however, that it was "not yet terminating its Subcontract with RCM," but reserved the right to do so. Graphic followed up with another letter to Arch, dated May 3, reiterating the notice of default and advising that "Graphic is not yet taking the next step of terminating the Subcontract and making demand on the Bond in the hope that RCM and/or Arch" would arrange to quickly complete the unfinished work and "make a good faith move to reduce the large financial impacts Graphic has suffered."[4] In a letter dated May 3, Arch acknowledged receipt of Graphic's April 30 and May 3 communications, noting its

---

[4] The May 3 letter detailed the expedited remedial work Graphic deemed necessary to allow building occupancy by June 1 and asked that "RCM and/or Arch deploy, without further delay, the qualified staff, materials and equipment needed to correct defectively rendered Work" or to complete unfinished work. Among the listed requests, subject to the project owner's agreement, was "a warranty bond as a substitute for the window warranty that RCM has been unable to deliver."

understanding that Graphic was "not attempting to make a claim on the Arch Performance Bond."

In September 2019, Graphic sent a detailed letter to Arch, with a copy to RCM, stating that it was providing notice of RCM's default pursuant to the terms of the performance bond and demanding that Arch pay $3.175 million in remedial costs that Graphic had incurred "as a result of [RCM]'s failure to perform." In response, Arch denied liability on the ground that Graphic had not complied with multiple prerequisites specified in the bond for triggering Arch's surety obligations. Arch noted, inter alia, the undisputed fact that Graphic had "not terminat[ed] RCM before it undertook to complete RCM's scope of work," a failure that, according to Arch, rendered the bond "null and void."

In December 2019, Arch filed this action seeking a declaratory judgment that Graphic had materially breached the performance bond, thereby discharging Arch from liability.[5] Graphic counterclaimed, asserting that the preconditions for performance set forth in section 3 of the bond do not apply to Arch's obligations to indemnify Graphic for its costs related to RCM's defective work or the surety's obligation to provide a window

_____

[5] An earlier state-court lawsuit filed by Graphic against RCM, later amended to include Arch, was removed to federal court by Arch and consolidated with this action. In its brief, Arch reports that, in May 2021, an arbitration panel awarded Graphic roughly $1.8 million against RCM. We note these other proceedings solely as background; they play no role in our resolution of this appeal.

warranty in RCM's stead.  Arch subsequently moved for summary judgment.  In its opposition, Graphic asserted, among other arguments, that it could not satisfy the bond's termination requirement "because RCM had 'substantially completed' its work under the subcontract and thus could not be terminated."  Arch Insurance Co., 519 F. Supp. 3d at 61.

In granting summary judgment for Arch, the district court rejected Graphic's assertion that it was unable to terminate the subcontract.  It found that Graphic had "indisputably failed to comply with a condition precedent" for Arch's liability under the performance bond by "unilaterally arrang[ing] for third-party subcontractors to remediate RCM's work" instead of terminating RCM.  Id.  Accordingly, the court held that Graphic materially breached the bond and that Arch was "discharged from any and all liability" under it.  See id.  This appeal followed.

## II.

On appeal, Graphic reiterates its contention that it had no obligation to comply with section 3 of the bond to be entitled to the performance it demands from Arch, and it also again argues that termination was neither feasible nor legally permissible because RCM had substantially completed its work under the subcontract.  Before turning to those issues, however, we briefly pause to note a change in Graphic's approach.  As described above, Graphic asked the district court to impose two types of obligations

on Arch: indemnification for Graphic's costs in completing RCM's work and "complet[ion of] RCM's Warranty Obligations Post Completion." Graphic has abandoned its indemnification claim on appeal.[6] Hence, as stated by Graphic's counsel at oral argument, "the sole and only issue . . . in this appeal is to enforce Arch's post-completion guarantee of its obligation to issue a window warranty."

We review a district court's grant of summary judgment de novo. Clark Sch. for Creative Learning, Inc. v. Phila. Indem. Ins. Co., 734 F.3d 51, 54 (1st Cir. 2013). Here, as noted above, the material facts are undisputed. The parties' differences spring from the terms of the performance bond and related caselaw.

**A. The Terms of the Performance Bond**

The question at the heart of this appeal is whether section 3 of the bond, which sets forth a series of preconditions for Arch's obligation to act on behalf of RCM, applies to Graphic's window warranty claim. In relevant part, section 3 states:

> §3 If there is no [Contractor][7] Default under the [Subcontract], the Surety's obligation under th[e] Bond shall arise after:

---

[6] Graphic also brought a claim under Massachusetts's unfair business practices statute that it does not pursue on appeal. See Mass. Gen. Laws ch. 93A, §§ 2, 11.

[7] The performance bond identifies Graphic as "Owner," but provides in section 15 that, if the bond covers an agreement between a contractor and subcontractor, "the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor." Thus, we have replaced the term "Owner" in section 3 with "Contractor," "Construction

.1 the [Contractor] first provides notice to the [Subcontractor] and the Surety that the [Contractor] is considering declaring a [Subcontractor] default. Such notice shall indicate whether the [Contractor] is requesting a conference among the [Contractor], [Subcontractor] and Surety to discuss the [Subcontractor]'s performance . . . .

.2 the [Contractor] declares a [Subcontractor] Default, terminates the [Subcontract] and notifies the Surety; and

.3 the [Contractor] has agreed to pay the Balance of the [Subcontract] Price in accordance with the terms of the [Subcontract] to the Surety or to a contractor selected to perform the [Subcontract].

Under section 5 of the bond, "[w]hen the [Contractor] has satisfied the conditions of Section 3," the surety must take one of several specified actions at its own expense. These include arranging for the original subcontractor to complete the job; taking over completion of the work "through its agents or independent contractors"; arranging for a new subcontractor acceptable to the contractor; or, in lieu of completing the work, determining "the amount for which it may be liable" and making that payment to the contractor.

As described below, Graphic also invokes section 1 of the bond, which states in full: "The [Subcontractor] and Surety,

---

Contract" with "Subcontract," and "Contractor" with "Subcontractor."

- 9 -

jointly and severally, bind themselves, their heirs, executors, administrators, successors, and assigns to the [Contractor] for the performance of the [Subcontract], which is incorporated herein by reference."

## B. Governing Law of Contract Interpretation

Under Massachusetts law, "we construe [the] insurance policy de novo under the general rules of contract interpretation." Clark Sch. for Creative Learning, 734 F.3d at 55 (quoting Valley Forge Ins. Co. v. Field, 670 F.3d 93, 97 (1st Cir. 2012)). Neither party claims that the language of the performance bond is ambiguous; each insists that the plain language of the bond supports its position. We agree that there are no ambiguities in the contested provisions and, hence, our task is to "interpret [the bond] according to its plain terms." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 784 (1st Cir. 2011) (quoting Den Norske Bank AS v. First Nat'l Bank of Bos., 75 F.3d 49, 52 (1st Cir. 1996)); see also Nicolaci v. Anapol, 387 F.3d 21, 26 (1st Cir. 2004) ("Ambiguity is not created merely because the litigants disagree about the meaning of a contract.").

In examining the terms of the bond, we must be mindful that "a contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties." Starr v. Fordham, 648 N.E.2d 1261, 1270 (Mass. 1995) (quoting Shane v. Winter Hill Fed. Sav. & Loan

Ass'n, 492 N.E.2d 92, 94 (Mass. 1986)).  To ascertain "the scope of a party's obligations" under an agreement, we may not "isolat[e] words and interpret[] them as though they stood alone," id. at 1269 (quoting Bos. Elevated Ry. Co. v. Metro. Transit Auth., 83 N.E.2d 445, 451 (Mass. 1949)), but must instead "construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose," USM Corp. v. Arthur D. Little Sys., Inc., 546 N.E.2d 888, 893 (Mass. App. Ct. 1989) (cited favorably in MCI WorldCom Commc'ns, Inc. v. Dep't of Telecomms. & Energy, 810 N.E.2d 802, 810 (Mass. 2004)).  Surety agreements are similarly construed.  See St. Paul Fire & Marine Ins. Co. v. VDE Corp., 603 F.3d 119, 122 (1st Cir. 2010) ("As a general matter, 'surety contracts are subject to the same rules of construction as other contracts.  The terms of surety obligations, therefore, "should be interpreted as a whole, and not out of the context of all the other terms."'" (quoting In re Sinking of M/V Ukola, 806 F.2d 1, 4 (1st Cir. 1986))); Gordon & Dilworth v. Abbott, 154 N.E. 523, 524 (Mass. 1926) ("The liability of a surety or guarantor is to be ascertained from the terms of the written instrument by which his obligation is expressed, construed according to the usual rules of interpretation in the light of the subject-matter, the well-understood usages of the business, and the relations of the parties to the transaction.").

**C. Does the Bond Oblige Arch to Provide the Window Warranty?**

It is undisputed that Graphic fulfilled the requirements of section 3.1 of the performance bond with respect to its warranty claim. As described above, Graphic sent multiple letters to Arch stating that it was considering declaring a default, including on the warranty issue, and it sought a conference among the parties (which occurred in April 2019). It also is undisputed that Graphic did not fulfill the requirements of sections 3.2 and 3.3. Although Graphic declared RCM in default, it did not terminate RCM and it never agreed to pay Arch any portion of the contract price. Graphic, however, maintains that its demand that Arch provide a window warranty does not require compliance with section 3's conditions.

Graphic's argument depends on distinguishing the provision of the window warranty from the physical work that RCM was obligated to perform under the subcontract. Its principal contention is that a "post-completion" warranty obligation is not reasonably subject to section 3's termination requirement. Graphic, however, is not making a post-completion warranty claim in the sense that such a claim ordinarily would be understood -- i.e., a demand under an operative warranty for remediation of construction work that is revealed, post-completion, to be defective. See, e.g., Sweetwater Apartments, PA, LLC v. Ware Constr. Servs., Inc., No. 11-CV-155, 2012 WL

3155564, at \*5 (M.D. Ala. Aug. 3, 2012) (concluding that the surety was liable for repairs under a one-year warranty issued by its principal) (citing cases).[8]  Rather, Graphic asserts that RCM failed to produce a promised warranty.

The caselaw Graphic cites provides no support for excluding that sort of warranty claim from section 3's scope. Together, sections 3 and 5 of the A312 bond protect the surety by clearly signaling when the surety must take over for a defaulting principal and by giving the surety the choice on how to remediate the default.  See generally St. Paul Fire & Marine Ins. Co. v. City of Green River, 93 F. Supp. 2d 1170, 1178 (D. Wyo. 2000), aff'd, 6 Fed. App'x 828 (10th Cir. 2001) (noting the importance of preserving the surety's "ability to protect itself pursuant to performance options granted under a performance bond"); Enter. Cap., Inc. v. San-Gra Corp., 284 F. Supp. 2d 166, 177 (D. Mass. 2003) (same).  Graphic appears to be arguing that this protection is inapplicable to its warranty claim for two primary reasons: (1) it is not asking Arch to remedy or complete RCM's physical window work, and (2) the warranty does not come into play until after the physical work is done.  Neither reason stands up to scrutiny.

---

[8] We cite to the unpublished decision in Sweetwater Apartments because Graphic relies on that case, and on a half-dozen other cases cited in Sweetwater, both published and unpublished, to support its argument.

The obligation to provide a manufacturer's window warranty is a distinct element of the Graphic-RCM subcontract. The mere fact that the warranty obligation does not involve hands-on construction does not reveal why it would be excluded from the conditions in the bond that apply to other performance elements of the subcontract. Nor does timing provide the explanation. While the benefits of a warranty ordinarily may be realized after a construction project is completed (or substantially completed), see, e.g., Stonington Water St. Assocs., LLC v. Hodess Bldg. Co., 792 F. Supp. 2d 253, 260 (D. Conn. 2011) (describing "the punch list" as the "list of warranty work"), procuring the warranty from the window manufacturer was an obligation that needed to be fulfilled before RCM's performance under the contract would be complete. Indeed, Graphic has valued RCM's warranty obligation at $2 million, a significant proportion of the subcontract's total price tag of roughly $8.6 million.[9]

We see nothing in the language of the bond that would exclude RCM's default in fulfilling the warranty obligation from section 3's requirements. The performance options available to Arch under section 5 of the bond are no less suitable for the

---

[9] In its Opposition to Plaintiff's Motion for Summary Judgment, Graphic stated that it was "forced . . . to sign an independent guaranty in the amount of $2 million providing the [project] Owner the same rights as under the contractual warranty," and it listed "a warranty liability in the amount of $2 million" among its damages related to RCM's work.

- 14 -

warranty obligation than for the physical work of fixing the windows. Arch might have attempted to secure the warranty by using its own agents or a new subcontractor to remedy the window problems, as contemplated by section 5. Or it might have attempted to secure the warranty through negotiations with the window manufacturer based on the remedial work that RCM had already performed.

Importantly, as these possible scenarios for Arch's actions under section 5 reveal, the warranty "performance" that Graphic seeks is inextricably linked to the window installation itself. The warranty was withheld based on the manufacturer's assessment that the installation remained problematic even after RCM's remedial efforts.[10] In effect, then, Graphic's version of a warranty claim is an attempt to shift to Arch the risk Graphic assumed when, instead of terminating RCM and placing the burden of remediating the window installation in Arch's hands, it persisted in demanding action from RCM.

To separate the subcontract's window installation and warranty obligations in the way Graphic proposes would be inconsistent with the "language, background, and purpose" of the performance bond, USM Corp., 546 N.E.2d at 893, as it would clearly

_____

[10] In a March 2019 email to Graphic, the window manufacturer referred to ongoing "installation deficiencies at this project [that] are incompatible with issuance of a warranty."

- 15 -

frustrate the bond's design to allow the surety to manage the response to a default for which it would be responsible. With respect to securing the warranty, Graphic's decision to eschew termination and continue working with RCM despite Graphic's ongoing dissatisfaction with RCM's performance was no different, under the terms of the bond, from a unilateral decision to replace RCM with a third-party subcontractor. Both decisions sidestep the requirements of section 3 and "extinguish[] the options available to [the surety] under [section 5] of the performance bond." Solai & Cameron, Inc. v. Plainfield Cmty. Consol. Sch. Dist. No. 202, 871 N.E.2d 944, 956 (Ill. App. Ct. 2007); see also, e.g., Seaboard Sur. Co. v. Town of Greenfield, 370 F.3d 215, 220 (1st Cir. 2004) (noting that "[c]ourts have consistently held that an obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material breach, which renders the bond null and void" (quoting St. Paul Fire & Marine, 93 F. Supp. 2d at 1178)); Dragon Constr., Inc. v. Parkway Bank & Tr., 678 N.E.2d 55, 58 (Ill. App. Ct. 1997) ("Surely, [the insurer] would not have issued the surety bonds if it did not have the authority to protect itself through the selection of a successor contractor.").

Arguably, then, to obtain Arch's performance of RCM's promise to provide the manufacturer's window warranty, Graphic should have terminated RCM and asked Arch to take over the task of

properly completing the window installation work to the satisfaction of the manufacturer. At a minimum, however, the terms of the bond required Graphic to comply with section 3's prerequisites to trigger Arch's specific obligation to furnish the window warranty. Put simply, Graphic is claiming that RCM defaulted in performing the warranty portion of its window obligations, but it has not satisfied the bond's condition precedent for Arch to assume responsibility for that default.

In resisting this construction of the bond, Graphic has insisted that, pursuant to the subcontract and general principles of contract law, it properly gave RCM the opportunity to cure the window defects.[11] See generally 4A Philip L. Bruner & Patrick J. O'Connor, Jr., 4A Bruner & O'Connor on Construction Law § 12:42 (August 2021) (hereafter "Bruner & O'Connor") (stating that "[t]ermination for default clauses commonly require the obligee to give the contractor and the surety 'notice of default' prior to termination for default" for the purpose of "giv[ing] the contractor an opportunity to 'cure' the default and thereby preclude termination"). Moreover, Graphic says, it would have

_____

[11] In its September 2019 letter to RCM and Arch, Graphic said that it had "expressly negotiated the right to cure RCM's defects without terminating the Subcontract and collect these costs from both RCM and the Surety." Although section 16.3.1 of the subcontract states that Graphic is authorized to correct RCM's defective work and charge RCM for "any damage, loss, cost or expense suffered or incurred," the provision makes no reference to the surety.

- 17 -

faced "the potential risk of a claim for wrongful termination" if it had terminated RCM and invoked the performance bond instead of working with RCM to resolve the window issues.

We acknowledge the difficulty contractors may face in navigating between the risk of premature termination of a subcontractor and the risk of failing to comply with the requirements of section 3 of the A312 performance bond. See 4A Bruner & O'Connor, supra, at § 12:38 (noting that "[a] wrong decision to terminate is a material breach of contract and results in the obligee's completion of the contract without recourse against the contractor or surety" and that "[t]he wrong decision not to terminate may result in unsatisfactory completion . . . , with recourse limited to the contractor and not the surety"). Yet that is the framework under which Graphic agreed to operate pursuant to the performance bond, and it was obliged to adhere to the bond's terms to invoke the bond's coverage. Under those terms, it was Graphic's burden to determine if, and when, RCM had defaulted and to terminate RCM if it sought recourse for the default from Arch. See generally Salois v. Dime Sav. Bank of N.Y., FSB, 128 F.3d 20, 26 n.10 (1st Cir. 1997) ("[U]nder Massachusetts law, 'one who signs a writing that is designed to serve as a legal document . . . is presumed to know its contents.'" (quoting Hull v. Attleboro Sav. Bank, 596 N.E.2d 358, 362 (Mass. App. Ct. 1992)) (omission in original)).

In any event, the record unequivocally belies Graphic's suggestion that a delicate balance between premature and required termination existed here. Graphic first sought remediation from RCM in May 2018, and it complained repeatedly about defective window installation -- along with making demands for the warranty -- through the spring of 2019. In the first of two letters sent to RCM in October 2018, Graphic demanded "a full-scale remediation effort" that would "ensure complete and permanent correction of every window." In the same letter, Graphic directed RCM "to immediately provide the missing warranty," along with "confirmation that the final installation currently in progress complies with the manufacturer's requirements."

More than two months later, in its January 2019 letter notifying RCM and Arch of RCM's potential default, Graphic stated that RCM was in "material breach of the Subcontract" and identified, among the breaches, the "[f]ailure to install properly all windows in accordance with the manufacturer's requirements." In March 2019, as noted above, the window manufacturer communicated its concern about continuing installation deficiencies. Then, in April and May 2019, Graphic notified Arch of RCM's default, including the failure to provide the warranty, while expressly declining to terminate the subcontract.[12] Hence, even if Graphic

---

[12] In May 2019, Graphic proposed three "undertakings" to RCM and Arch "to avoid termination and to mitigate the cascading

- 19 -

justifiably and properly allowed RCM to attempt to cure the window problems and obtain the manufacturer's warranty into the fall of 2018, that rationale for refraining from termination cannot insulate Graphic's decision not to do so when those initial curative efforts failed -- or at least by the following spring, when it deemed RCM in default.[13]

We likewise find untenable Graphic's contention that section 1 of the bond, which broadly asserts RCM's and Arch's joint and several responsibility for performing the contract, supports its warranty claim against Arch. Graphic makes the astonishing assertion that "[n]owhere in [section] 1 of the Arch Performance Bond or the Subcontract . . . are any of [Graphic]'s rights

---

negative consequential impacts associated with such a decision." As noted above, these included a demand that "RCM and/or Arch secure a warranty bond as a substitute for the window warranty that RCM has been unable to deliver."

[13] We note that, in deposition testimony, Graphic's representative, Marvin Lahoud, stated that Graphic's interactions with Arch and RCM in 2018 and 2019 were aimed at eliciting cooperation in resolving the construction problems without the need to terminate RCM. Lahoud explained that RCM's "specific manufacturing techniques and abilities" precluded terminating the subcontract because no other subcontractor could have satisfactorily completed the modular construction work in RCM's stead, at least without extraordinary expense and a lengthy delay. We do not minimize the difficulties Graphic faced in completing the project in a timely way. However, the view that only RCM could appropriately perform the remedial work is inconsistent with Graphic's acceptance of a bond under which Arch's obligation to perform includes the right to choose the path forward in the event of a default, including the option to select alternative contractors.

contingent upon termination of RCM." While that statement is accurate, basic contract principles -- and Massachusetts law -- make clear that section 1 of the bond is only reasonably understood as qualified by the provisions and conditions that follow. See McAdams v. Mass. Mut. Life Ins. Co., 391 F.3d 287, 299 (1st Cir. 2004) ("Contracts must . . . be read as a whole."); Bos. Elevated Ry. Co., 83 N.E.2d at 451 (rejecting a construction of a contract derived from "isolating words and interpreting them as though they stood alone"). The surety is not a party to the subcontract, and it necessarily plays a different role in the relationship among the parties. That role is defined by the bond, which, for the specific warranty claim at issue here, requires Graphic to fulfill the prerequisites of section 3 before Arch's "obligation under th[e] Bond shall arise." See Elm Haven Constr. Ltd. P'ship v. Neri Constr. LLC, 376 F.3d 96, 100 (2d Cir. 2004) (noting that one of the "standard principles of contract interpretation" applicable to surety bonds "is that, before a surety's obligations under a bond can mature, the obligee must comply with any conditions precedent" (quoting U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 51 (2d Cir. 2004))).

Hence, pursuant to the unambiguous language of the performance bond, any obligation of Arch to provide the window warranty was conditioned on Graphic's termination of RCM, an action Graphic chose not to take.

**D.  Was Termination of RCM Foreclosed as a Matter of Law?**

As a backup argument, Graphic asserts that applicable judicial precedent prevented it from terminating the subcontract after RCM had delivered and installed the modules -- i.e., after the "physical" work covered by the subcontract, albeit defective, was completed.  Graphic's contention that it was not permitted to terminate RCM despite the bond's requirement rests on the proposition that a contractor may not lawfully be terminated once its work under a contract is "substantially complete."  But even if this proposition is generally correct, see 4A Bruner & O'Connor, supra, at § 12:45,[14] it does not help Graphic on the record before us.

Section 10.1.3 of the Graphic-RCM subcontract defines "substantial completion" as "the time when construction Work is sufficiently complete in accordance with the Drawings and Specifications so the Owner can occupy or utilize the Work or a designated portion thereof for the use to which it was intended."  That definition tracks the widely accepted understanding of "substantial completion" in the construction industry in Massachusetts and elsewhere.  See Kettle Brook Lofts, LLC v. Specht, 177 N.E.3d 176, 186 (Mass. App. Ct. 2021) ("[T]he term

---

[14] Section 12:45 of the Bruner & O'Connor treatise states that an "obligee may not terminate for default a construction contract that has been substantially performed."

- 22 -

['substantially complete'] is well understood in the context of construction of real property to refer to a state in which the property is ready to be used for its intended purpose, in this case, residential occupancy."); Kinetic Builder's Inc. v. Peters, 226 F.3d 1307, 1315 (Fed. Cir. 2000) ("A project should be considered substantially completed when it is capable of being used for its intended purpose."); 3 Bruner & O'Connor, supra, at § 8:27 ("As a general rule, substantial completion is defined as that point in the construction where the work is sufficiently complete that the owner may occupy or utilize the work for the use for which it was intended."). Substantial completion does not necessarily mean that the work is free of all defects, but only that there is "such an approximation to complete performance that the owner obtains substantially what was called for by the contract." Handy v. Bliss, 90 N.E. 864, 864 (Mass. 1910); see also id. at 864-65 (noting that "there might be a substantial performance of the contract" even if "omissions and imperfections" remain).

Graphic's position appears to be that these principles of construction law supersede the bond's pre-condition for termination (as we have construed the bond) for their warranty claim. Specifically, it argues that it could not terminate RCM after RCM had installed the modules because the subcontract work was at that point substantially completed -- notwithstanding the

defects. However, this assertion of substantial completion directly conflicts with Graphic's representations to RCM and Arch throughout the nine months, from July 2018 through April 2019, in which Graphic was demanding remediation of the work performed by RCM before ultimately declaring RCM in default. In its September 2019 letter to RCM and Arch, Graphic recounted that, when the first modules were delivered and installed, the defects -- including leaking windows -- "were so prolific and systemic that it precluded [Graphic] and any of its subcontractors from completing the remaining work on the Project." In its April 30, 2019 letter to RCM and Arch providing notice of default, Graphic listed among RCM's material breaches of the subcontract RCM's "[f]ailure to deploy the labor and materials needed to achieve Substantial Completion of the Work by May 31, 2019." Indeed, several days later -- in its letter of May 3 -- Graphic demanded that RCM and Arch expedite the remedial work so that the building would be ready for occupancy by June 1. In that letter, Graphic accused RCM of "fail[ing] to perform under the terms of the Subcontract, or for that matter, to perform by any measure."

Graphic, in other words, told RCM and Arch that RCM had not yet achieved "Substantial Completion" of its work as of May 2019 and that the building was not yet in a condition to be occupied at that time. Graphic's argument that it could not lawfully terminate RCM once the modular units had been installed -- or even

after RCM's unsuccessful attempts to fix the windows -- thus lacks both legal and factual support.  We note, moreover, that Graphic took the position that the option to terminate remained as late as May 2019, when it advised RCM and Arch that it was "not yet taking the next step of terminating the Subcontract and making demand on the Bond."[15]

In sum, the performance bond required Graphic to terminate RCM to trigger Arch's obligation to provide a window warranty, and the undisputed facts in the record show that Graphic had ample knowledge of RCM's alleged failures at a time when termination remained a viable option under the relevant principles of law.  The district court therefore properly granted summary judgment for Arch.

Affirmed.

---

[15] In its reply brief, Graphic asserts that Arch may not rely on deposition testimony to defend the district court's grant of summary judgment by "attempt[ing] to establish that substantial completion was never reached and that [Graphic] consciously chose not to terminate Arch," stating that the testimony "at most, raises a question of fact as to whether termination was permissible when the warranty issue arose."  Although we recount some of that testimony above, see supra note 13, our conclusion regarding substantial completion is based solely on the legal principles cited above as applied to the undisputed facts in the record, including Graphic's clear, express representations in the correspondence it sent to RCM and Arch.